724 F.Supp. 698 (1989)
TERESA P., Cesar P., Jorge A.P., Evangelina P., Carmen P. and Carlos P., by their next friend T.P.; Marcelo J., Carolina J. and Guadalupe J., by their next friend M.J.; Freddie P. by his next friend T.P.; Giovani T. and Viviana T. by their next friend C.T.; Juan A. and Maria A. by their next friend V.A.; P.K.V.; Jose A., on behalf of themselves and all similarly situated, Plaintiffs,
v.
BERKELEY UNIFIED SCHOOL DISTRICT; Steve Lustig, Myron Moskovitz, Joe Gross, Ronald Kemper and Elizabeth Shaughnessy, members of the Board of Education of the Berkeley Unified School District; Louis R. Zlokovich, Superintendent of the Berkeley Unified School District, Defendants.
No. C-87-2396 DLJ.
United States District Court, N.D. California.
September 8, 1989.
*699 Peter D. Roos with the Multicultural Educ. Training & Advocacy Project, San Francisco, Cal., Deborah Escobedo and Susan Spelletich, San Francisco, Cal., with the Legal Aid Soc. of Alameda County, Cal., for plaintiffs.
Celia Ruiz and Thomas B. Donovan with the law firm of Dinkelspiel, Donovan & Reder, San Francisco, Cal., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
JENSEN, District Judge.

I. INTRODUCTION
This case was tried to the Court on August 23, 1988. Defendants were represented by Celia Ruiz and Thomas B. Donovan of Dinkelspiel, Donovan & Reder. Plaintiffs were represented by Peter D. Roos of the Multicultural Education Training and Advocacy Project (META), and Deborah Escobedo and Susan Spelletich of the Legal Aid Society of Alameda County.
A thorough, comprehensive evidentiary showing was made by both parties. Forty-six witnesses testified. After nine days of testimony, plaintiffs rested their case on September 8, 1988. After 10 further days of testimony, defendants rested their case on September 23, 1988.
The Court examined the documentary evidence, heard the oral testimony, considered the arguments of counsel, and reviewed the written memoranda of the parties. Having done so, the Court makes the following findings of facts and conclusions of law.

II. FINDINGS OF FACT

A. Jurisdiction

1. The Court has jurisdiction over this case under 20 U.S.C. § 1708; 28 U.S.C. §§ 1343(a)(3) and (4); 28 U.S.C. § 1331; and 28 U.S.C. §§ 2201-2202.

B. Parties

2. Plaintiff class, as certified by this Court on May 4, 1988, pursuant to Rule 23(b)(2), consists of all students currently enrolled in the Berkeley Unified School District (the BUSD or District), who are of limited English proficiency by reason of having a first or home language other than English and who consequently have a barrier to equal participation in the BUSD programs.
3. The District is the governmental entity responsible, under California law, for providing public education to students residing within the City of Berkeley.
4. The District operates on the basis of federal and state funds, and executes state law compliance assurances in order to receive state funds.
*700 5. The District is an educational agency, within the meaning of section 221 of the Equal Educational Opportunities Act, 20 U.S.C. § 1720.
6. Defendants Steve Lustig, Myron Moskovitz, Joe Gross, Ronald Kemper, and Elizabeth Shaughnessy, at the time of trial, constituted the publicly elected Board of Education of the Berkeley Unified School District (the Board).
7. The Board is responsible for the governance and operation of the District and for policy decisions affecting the District's educational programs.
8. Defendant Louis R. Zlokovich is the former Superintendent of the District. He resigned effective June 30, 1988. Dr. Andrew J. Viscovich is the new District Superintendent and is responsible for the daily operation of the District, the administration of its educational programs, and the implementation of policy decisions made by the Board.

C. Nature of the Action

9. Plaintiffs seek relief against defendants under section 204 of the Equal Educational Opportunities Act (EEOA), 20 U.S.C. § 1703, and under section 601 of Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d, and its implementing regulations (Title VI regulations). Plaintiffs claim that they have been denied equal educational opportunity because the District has failed to take appropriate action to overcome language barriers faced by plaintiffs. Plaintiffs allege that the District's testing and procedures for the identification and assessment of the District's limited English proficient (LEP) students is inadequate, and that the District employs inappropriate criteria and procedures to determine when the District's programs of special language services for individual LEP students are no longer necessary or appropriate. They also claim that the District has failed to allocate adequate resources to the District's special language services for LEP students, and has failed to assure that teachers and other instructional personnel have the requisite qualifications, credentials and skills to provide these services effectively. Finally, plaintiffs contend that the District has not provided them with adequate English language development instruction, and adequate native tongue instruction and support.

D. The BUSD's Limited English Proficient Students

10. As of June 15, 1988, 571 LEP students were enrolled in the District which has a total of about 8,000 students. The District's LEP students speak approximately 38 languages other than English. The language groups comprising the largest number of the District's LEP students are: Spanish (268), Vietnamese (60), Cantonese (40), Laotian (32), Mandarin (32) and Tagalog (20). The remaining 32 languages are represented by a maximum of 16 students in any single non-English language category. Some of these languages are spoken by only 1 to 3 of the District's LEP students.
11. The District's LEP students are spread throughout its several schools. As of June 15, 1988, most of these children (412) were elementary school students, which includes kindergarten through sixth grade. The District has 12 elementary schools, 7 serving grades kindergarten through 3, 3 serving grades 4 through 6, and 2 schools  the Arts Magnet School and the Model School  serving grades kindergarten through 6. 86 LEP students, who speak a total of 14 different languages, were enrolled in the District's 2 junior high schools, which covers grades 7 and 8. 73 LEP students, who speak 14 different languages, were enrolled at Berkeley High School.

E. Identification and Assessment of LEP Students

12. As part of the registration process, the parents and guardians of each student enrolled in the District are asked to fill out a Home Language Survey to determine whether a language other than English is spoken in the student's home. The survey form is written in English, Vietnamese, Spanish, Chinese, Portuguese, Arabic, Korean, *701 Farsi, Samoan, Hebrew, Japanese, Italian, and Armenian. On the basis of the survey returns received from parents, a list of all students from homes where a language other than English is spoken is prepared.
13. During the first week of school, BUSD officials, including testers who are proficient in a number of languages, visit each District school site to test all students who are from homes where a language other than English is spoken to determine the oral and written English proficiency of such students.
14. The BUSD staff conducts tests as needed for students enrolling later in the school year and students who were absent during the initial testing period or who were unable for any other reason to complete the testing during the first week of school.
15. The English oral proficiency tests, used by the District for identification and assessment of LEP students, are the IDEA Oral Language Proficiency Tests (IPT or IPT I and IPT II). The IPT I is given to students in grades kindergarten through 6, and the IPT II is given in grades 7 through 12.
16. The English reading and writing proficiency of potential LEP students in grades 2 through 8 is assessed by BUSD through use of the Comprehensive Test of Basic Skills (the CTBS), a standardized achievement test. The CTBS tests the students' achievement in reading, language arts, and mathematics.
17. Language minority students, in grades 9 through 12, are identified and assessed with respect to their individual English language proficiency through a battery of tests. These tests, which include those referred to as the TEPL, STEL, SLEP and ELSA, test English oral proficiency, reading, writing, grammar, and listening skills.
18. The BUSD Secondary School ESL Coordinator consulted with a testing expert from San Francisco, who had reviewed the TEPL favorably. The Coordinator also reviewed the subsequent academic performance of all students who were tested as fluent in the TEPL in 1986-87 and 1987-88, and found that these students were in fact successful students in the regular English program.
19. The Coordinator also administered the TEPL to native English speakers to establish a comparison group. She found that native English speaking students scored at the E, F, or G levels. Since the District uses a score of G (or perfect) before a LEP student is reclassified as fluent in English, the fact that native English speaking students scored E or F on the test showed, if anything, that the TEPL is over-inclusive.
20. The grading system used for the writing portion of the TEPL requires 3 ESL teachers to independently evaluate and agree that the student's writing is of such quality as to identify the student as fluent.
21. Based on these various considerations, the BUSD Coordinator, concluded that the TEPL could and would be used as a valid test for English language proficiency.
22. The BUSD uses the TEPL in combination with other criteria, such as the IPT and the SLEP proficiency tests, in order to reduce the potential for error in use of the TEPL alone.
23. The District conducts oral interviews to assess students' proficiencies in some of the languages spoken by LEP students. A written questionnaire is used to guide the interview process.
24. If the District has an appropriate native language test available, the District also administers tests to LEP students to determine their proficiency in their native language. The District tests Spanish speaking students with a Spanish CTBS to assess Spanish reading skills, and a Spanish IPT to test Spanish oral skills. To test oral proficiency in Cantonese, the District utilizes the Oakland Oral Cantonese test developed by the Oakland Unified School District. The District also has a Chinese Reading and Writing test.
*702 25. In Berkeley, native tongue testing plays no role in the identification of LEP students or in reclassifying them as fluent English proficient (FEP).
26. The BUSD conducts its English as a Second Language (ESL) based program on the premise that there is no need to test a student's native tongue proficiency because most if not all instruction and tutorial support is delivered in English.
27. Students identified by the BUSD as LEP students are placed in the District's program of special language services. Parents are notified of such placement. The notification letters are translated where appropriate into Spanish, Vietnamese, and Chinese. The parents are given the option to withdraw their child from the program if the parents first meet with the District and are informed of the program's benefits. Parents have the option of transferring their child from one type of special language services program to another where choices are available based on the language needs of the individual child. Parents also may withdraw their child from all participation in special language services. If the parents do so, the District monitors the child's academic performance for 6 months, and, if the child experiences academic difficulty, asks the parents to reconsider enrolling their child in one of the District's programs of special language services.

F. The BUSDs Educational Philosophy, Parental Input, and Budget

28. The District has had a long-standing commitment to an integrated educational system. This commitment is evidenced by the District's voluntary desegregation plan, which was instituted in 1968, and which is implemented, inter alia, by racially mixed and heterogenous classrooms and a curriculum that emphasizes cross-cultural awareness and sensitivity.
29. District policy is directed at avoidance of segregation of any kind, whether by reason of race, national origin, language, educational achievement, or otherwise.
30. The District has instituted programs aimed at helping "at-risk," low income, and disadvantaged minority students, including racial, ethnic, and language minority, i.e., LEP students.
31. The development of the District's programs of special language services was the result of extensive planning by District personnel. Educational theories, educational philosophies, fiscal resources, human resources, the available curriculum materials, and parental input and preferences, all were considered.
32. There is parental support for the District's program structure, which provides both ESL and bilingual programs.
33. As an important element in assuring an effective program of special language services for LEP students, the District seeks the support and approval of the parents of LEP students. The District invites parents of LEP students to participate in a District Advisory Committee, which was formed in compliance with state law to permit parental review of the overall educational plan for LEP students, and to participate in individual school, or site, advisory committees. These committees provide guidance to the District's administrators and principals in the process of designing the District's programs of special language services.
34. The District Advisory Committee considered the question of which type of special language program was preferable. Parental preferences were considered by the District in developing its programmatic designs for special language services. The BUSD Master Plan for its programs was approved in June 1987 by a majority of the LEP parents participating in the District Advisory Committee.
35. In April 1988, the District commissioned a survey of the parents of all its kindergarten through sixth grade LEP students. That survey, to which 81% of all families who had LEP students enrolled in the District responded, showed that Hispanic parents tended to prefer a bilingual, primary language program to preserve culture and language, while Asian parents and others tended to prefer the ESL program *703 because it represented the fastest way to learn English. The survey results indicated that most parents of LEP students, including Hispanic, Asian, and others, were satisfied with the education their children were receiving from the District.
36. The existing structure and design of the District's special language programs was adopted by the BUSD after consideration of parental committee input, available resources, and alternative program approaches.
37. Measure H, a Berkeley school funding measure approved by the electorate, provides an additional $30 per LEP child for educational materials that are used to supplement the regular educational materials provided to other students in the District.
38. The District experienced a severe financial crisis in 1986 that resulted in its near bankruptcy. Bankruptcy was avoided with the help of a loan from the State of California. The District is currently repaying that loan and is operating under the supervision of a trustee who has been appointed by the state to ensure repayment of the loan.

G. The BUSDs Special Language Services

39. The District has adopted two types of special language services: (1) a Spanish bilingual program; and (2) ESL programs in three separate forms. The primary purposes of all the District's special language services are to help LEP students develop fluency in English and to provide academic support to LEP students while the students learn English.
40. The District's special language programs are supervised by the District's Coordinator of Bilingual Education.

1. The Spanish Bilingual Program
41. The District's Spanish bilingual program is offered in grades kindergarten through 6. Students in the District's Spanish bilingual program are taught to read and write in Spanish before they are taught literacy skills in English. They are taught by teachers who are proficient and qualified to teach in Spanish.
42. The Spanish bilingual program in the District emphasizes English language development. Native language academic support is provided in all subjects.
43. The District has conducted bilingual education programs, both with and without native language support, since the early 1970s.
44. In 1984, the District examined its experience with native tongue instruction programs and concluded that the program did not produce satisfactory English and academic results. The program was modified to stress English language development intended to help the student gain fluent English proficiency (FEP), as quickly as possible, in order to participate in academic classes taught in English.

2. The ESL Program
45. The District provides ESL special language services to all LEP students in grades kindergarten through 12 who are not in the Spanish bilingual program. These services feature instruction delivered in the English language by a teacher who may be proficient only in English. The ESL instructional curriculum focuses on rapid development of English language proficiency through the delivery of a structured English curriculum. These ESL-based programs, and the techniques used to implement them, are based upon generally accepted educational theories.
46. At both the elementary and secondary levels, the ESL instructional curriculum teaches English by incorporating academic themes being taught in the regular classroom. This approach is intended to provide both instruction in the English language and simultaneous academic instruction. Academic achievement in areas other than English language development is aided by specialized English instructional techniques, and by the help of the District's tutors and instructional aides who work with LEP students enrolled in the District's ESL-based programs.
47. The District's ESL programs are implemented by heterogeneous classroom *704 placement of students intended to avoid isolating or segregating LEP children.

a. The Elementary ESL-ILP Program

48. At the kindergarten through sixth grade level, all LEP students are assigned to "self-contained" heterogeneous classrooms. The LEP students receive academic instruction from the regular classroom teacher, who is expected to use instructional strategies beneficial to students needing extra help with learning. The LEP students receive English language instruction from ESL resource teachers on a "pull-out" basis, either individually or in small groups. In addition, academic assistance is provided by tutors who work with the LEP children within the classroom and, on occasion, on a pull-out basis.
49. In order to coordinate instruction between the regular classroom teacher, the ESL resource teacher, and the tutor, the ESL elementary program is implemented through Individual Learning Plans (ILPs), and is therefore referred to as the "ESL-ILP" program. An ILP was required by expired state law, and, although no longer required, is still used in Berkeley to record assessment data regarding each LEP student's oral, reading, and writing proficiency as well as other useful information. The program contemplates that the principal, regular classroom teacher, parent, and tutor will meet to discuss the ILP.
50. The District's elementary school ESL-ILP program includes participation of 5 full-time equivalent itinerant ESL teachers (ESL resource teachers). The District hired 3.10 full-time equivalent teachers to staff the program for the 1988-89 school year. These teachers are assigned on the basis of LEP student needs.
51. The regular classroom program for LEP students in the District's elementary ESL-ILP program includes the participation of ESL teachers, tutors, and aides, and includes the use of materials for LEP students such as the IDEA Plus Kit, which is a special English language assistance program), computer programs, and the Reading Management System.
52. Because of the District's decentralized committee and site-based administrative structure, specific program implementation may vary from school to school, but all school sites offer the same configuration: a classroom teacher who is trained and uses several educational techniques and materials as well as supplemental educational resources directed to the educational needs of LEP students.
53. All LEP students in the elementary ESL-ILP program are to receive assistance from the District's extensive tutoring program. The tutors provide that assistance in the student's native language when necessary to assist the student's comprehension and when it is possible to do so. The District does not have tutors who speak the native language of each of its LEP students. The tutors usually work within the regular classroom, but sometimes tutor the children on a pull-out basis. Students are tutored either individually or in clusters, according to language proficiency and grade level.
54. Within the elementary school ESL-ILP program, the District looks at the relative English proficiency levels of students to determine how available tutorial support should be allocated.
55. The elementary ESL-ILP program is supervised by an experienced ESL resource teacher.

b. The Jefferson Chinese Cultural Enrichment Program

56. At the Jefferson School, which covers kindergarten through third grade, the District provides an ESL program with a Chinese cultural theme. The program is conducted in 3 self-contained classrooms by teachers, each of whom is proficient in either Cantonese or Mandarin, and all of whom hold bilingual/cross-cultural credentials. The program is open to all kindergarten through third grade students whose parents wish them to be enrolled in it. In the 1987-88 school year, there were 15 LEP students in the program.
57. ESL instruction is provided by the classroom teacher within self-contained classrooms. Academic instruction in the program is conducted in the English language. The teachers use their knowledge *705 of Mandarin or Cantonese as necessary to assist the comprehension of students whose native language is Mandarin or Cantonese. Chinese language is taught, as is Chinese culture, as an enrichment to the curriculum for one period daily.

c. The Secondary ESL Program

58. At the secondary level, which covers grades 7 through 12, the District's LEP students are placed in an ESL class after consideration of the student's relative English language proficiency and needs. The ESL classes range from a beginning level of English proficiency through an advanced level of English proficiency. These ESL classes focus on reading, writing, listening, and speaking English. Academic courses for beginning LEP students are offered by teachers knowledgeable in the use of Sheltered English techniques to teach both academic content and the English language. Additional English language instruction is given to LEP students by language development teachers who have been trained in ESL and Sheltered English methodology and techniques. LEP students receive additional assistance in academic subjects from tutors. 11 ESL, and specialized English content teachers, provide special language services at the secondary level.
59. The District's two junior high schools, which covers grades 7 and 8, are Willard Junior High School and Martin Luther King Junior High School.

(1) Willard Junior High School
60. At Willard, beginning LEP students receive one period of ESL a day in a self-contained classroom.
61. The beginning LEP students take an English class with the regular school population. This class is taught by the ESL resource teacher and provides special language help to LEP students. A tutor is assigned to this class.
62. Willard's LEP students also take a special back-up reading class designed for LEP students only. This class helps LEP students with the regular English class.
63. The beginning LEP student is assigned to either a science or a history class, and receives the assistance of a tutor.
64. The beginning LEP students also take math and are assisted in their math class by a tutor from the compensatory education program.
65. Intermediate LEP students at grades 7 and 8 also receive 1 period each day of both ESL and ESL Enrichment. In addition, these LEP students attend an English class where they receive the assistance of a compensatory education tutor and a back-up reading class where they receive the assistance of a compensatory education tutor. Intermediate LEP students also take a math course and a science/social living course.
66. Advanced level LEP students receive the same curriculum as intermediate level LEP students except that they do not take an ESL class. Instead, they take a history course which is taught by a teacher who is assisted by a compensatory education tutor.

(2) Martin Luther King Junior High School
67. At Martin Luther King, LEP students are taught in special classes for much of the school day. Every LEP student receives a daily ESL class at a level consistent with the student's English proficiency. LEP students are placed in special academic courses, such as history, math and science, which are taught by an ESL teacher. These classes are taught at a slower pace than regular classes and the teacher employs instructional strategies such as Sheltered English, cooperative learning, and cross-cultural awareness to make the class more understandable to LEP students.
68. The classes are generally smaller than a regular classroom, and utilize regular materials as modified and supplemented by the ESL teacher.
69. The LEP students receive additional academic support through the compensatory education resource specialist at Martin Luther King. This support is provided in small classes and through individual assistance.

*706 (3) Berkeley High School
70. At the high school level, beginning LEP students receive one period of ESL instruction a day. They also take an English language development class which is taught by an experienced language arts teacher who has satisfied the District's local designation criteria for ESL teachers and who gives the LEP students special help. Tutors are assigned to work with the LEP students in both ESL and English language development classes.
71. Beginning LEP students take a special history class which is primarily concerned with English language development and utilizes Sheltered English techniques. This class is also taught by a teacher who has satisfied the District's local designation criteria for ESL teachers.
72. Beginning LEP students are placed in a math class on the basis of an ability test that is given in Spanish, Cantonese, Vietnamese, and Mandarin as well as English.
73. LEP students also take an elective, generally either computer science, music or art, as recommended by the ESL resource specialist and the student's counselor.
74. High school students who are at either intermediate or advanced levels of LEP also receive 1 period of ESL a day. These students also take an English language development class, which is consistent with their English language proficiency level. These English classes are taught by teachers who have met the District's local designation criteria for ESL teachers, and the students also are assisted with these classes by tutors.
75. Intermediate and advanced LEP students take either a special history class for ESL students, which is taught using Sheltered English techniques, or a regular history class in which they are clustered to receive assistance from tutors who assist the regular teacher.
76. There is also a special Sheltered English biology class, which is taught by a biology teacher who is trained in ESL.
77. Intermediate and advanced LEP students also choose an elective class on the basis of individual preference and the recommendations of their counselors and the ESL resource specialist.
78. Tutors are not available in every primary language spoken by Berkeley's High School LEP students. However, the District attempts to find tutors for as many of the native languages spoken as is possible. High school students also are given language assistance at the Washington After School Program which provides language support for LEP students at every grade level.
79. The tutors who work with the high school LEP students are supervised by the ESL resource specialist at the high school.
80. The District's Secondary School ESL Coordinator developed the District's secondary level ESL curriculum and basic program design. She oversees all ESL teachers at the secondary level and is responsible for assuring a reasonable amount of consistency in the program and in the teaching methods employed from grade to grade and school to school. She also works to ensure consistency in basic procedures and materials.

H. The District's Other Special Services

81. The District carries out several programs designed to assist low achieving minority students, a category of students that includes LEP students as well as others. These programs include a Break the Cycle Program, an after-school program that focuses on self-awareness and behavior modification and is implemented with the help of tutors; and an Early Intervention Program that provides tutorial help in the classroom to assist kindergarten through third grade students overcome learning problems. Break the Cycle and Early Intervention are special programs aimed at identifying academic and language difficulties.
82. The District also conducts programs relevant to LEP students, through the Compensatory Education Program, which is funded by Economic Impact Aid funds from the State of California and Chapter 1 (or compensatory education) funds from *707 the federal government. At the kindergarten through sixth grade level, the District employs a compensatory education resource specialist who is a certificated teacher. This teacher works in the area of English language development, reading, and mathematics with all students who score below a designated level on standardized achievement tests.
83. The District also sponsors the ACCESS Program at Berkeley High School. This program provides tutors who directly assist LEP students and other students who have been identified as potential high school dropouts. The tutors assist these students with their academic work, help them develop in basic skills, and help them with job training tasks.
84. In addition to the special language program tutors, remedial education is provided to LEP students through the compensatory education instructional aides. The compensatory education aides are employed to assist the District's students at both the primary and secondary level during the school day. In addition, LEP students take advantage of numerous other compensatory education programs, including tutorial programs for low-achieving students at each school site.
85. Some LEP students receive guidance counseling and tutorial assistance through the District's University and College Opportunity Program. This program is directed specifically toward minority students and is designed to help ensure that minority students are encouraged to attend college.

I. The District's Curriculum

86. The District's regular curriculum is set by committee. The committee includes LEP parents and ESL or bilingual teachers. At the elementary level, the curriculum focuses on English language arts and efforts are made to assure that the curriculum and textbooks meet the special needs of LEP students.
87. The District's curriculum and materials include multi-ethnic literature that is designed to instill respect and knowledge about divergent cultures and values.
88. The District's regular curriculum for LEP students is supplemented by educational programs designed to provide additional assistance with English language development academic content.

J. Monitoring and Reclassification of LEP Students

89. In order to assess the progress of LEP students, all LEP students are tested annually for oral and written proficiency in English with the IPT I or IPT II test. Academic progress from grade 2 through 8 is assessed through the CTBS test each year. In addition, LEP students enrolled in the Spanish bilingual program take a Spanish language standardized achievement test, the CTBS Espanol, each year. The academic progress of all students in Berkeley High School, including LEP students, is assessed through the High School Proficiency Tests, grades, attendance, and teacher evaluations.
90. In order to be eligible to exit the District's programs of special language services, a LEP student must score at least at the 38th percentile level on the English version of the CTBS and at the "fluent" level on the IPT. The student also must score at least a grade of 4 in comprehension, fluency, vocabulary, and grammar, and a grade of 3 on pronunciation in the Student Oral Language Observation Matrix (SOLOM), which is administered either by the regular classroom teacher or by the ESL teacher. The student's grades, a writing sample, and the teacher's evaluation, also are considered. However, when a LEP student has been receiving language services for more than 3 years, the achievement test score criterion may be relaxed if the student's teacher and principal so recommend, with District supervisor approval.
91. If the student's test scores meet the District's criteria and his or her grades, writing sample, and teacher's evaluation indicate that reclassification is warranted, a LEP student may be reclassified as fluent English proficient (FEP) by the Student Appraisal Team (SAT), which consists *708 of the principal or his or her designee, the teacher, the tutor, and a parent.
92. A reclassified student is monitored for 6 months after reclassification. If the student's progress has not been satisfactory during that time, the SAT meets again to reconsider the reclassification decision, and the student may be furnished additional special language services. If the student's progress has been satisfactory, a final reclassification decision is made by the student's teacher and principal at the end of the six-month period.

K. The District's Teachers

93. The District's teaching staff appears to be competent and experienced.
94. The District's classroom teachers have received inservice training and workshops on educational strategies designed for effective teaching of LEP students.
95. All regular classroom teachers who teach LEP students are scheduled to receive training in Sheltered English methods during the 1988-89 academic year. Sheltered English is an instructional strategy used to teach regular academic courses to LEP students. It uses techniques such as a slower pace, vocabulary definition, and visual aids and props to facilitate comprehension for students who need help with their English. In addition, the regular classroom teachers utilize cooperative learning, group activity assignments, and other hands-on instructional strategies that have proven to be beneficial for LEP students.
96. The District's regular classroom teachers teach LEP students English language development by using Sheltered English techniques and ESL materials. The regular classroom teachers also draw upon other resources by working collaboratively with the ESL and regular academic tutors and with the ESL and compensatory education resource teachers.
97. At Thousand Oaks School, which covers grades kindergarten through 3, all regular classroom teachers receive training in and use Sheltered English methods.
98. At Oxford School, which covers grades kindergarten through 3, the regular classroom teacher's instructional strategy for the LEP student provides hands-on activities, cooperative learning, partnering, sharing, and oral language help.
99. At Emerson School, which covers grades kindergarten through 3, teachers working with LEP students also provide English instruction and have received training in and use ESL instructional strategies such as language modeling, the use of visual aids to develop vocabulary, simultaneous teaching of language and concepts, pacing of instruction, monitoring individual work, and cooperative learning.
100. At LeConte School, which covers grades kindergarten through 3, regular classroom teachers have been trained to use a number of instructional strategies and materials designed for teaching LEP students.
101. The District's ESL teachers all have participated in the District's 30-hour in-service training program in ESL methodology. This program was based upon the model used in the San Francisco Unified School District. The San Francisco model was approved by the State Department of Education (SDE). The District's secondary school ESL teachers also have passed objective examinations based on a test that was validated by the SDE. These ESL teachers also have had extensive in-service training in English language development.
102. Both the bilingual/bicultural credential and a language development specialist (LDS) certificate authorize a teacher to provide ESL instruction in the State of California. The SDE, however, has recognized a critical shortage of both these categories of teachers and has authorized school districts to develop and employ local criteria for designating teachers as qualified to teach ESL. The District has developed and employs such criteria.
103. The District's local designation criteria for an ESL resource teacher requires: (a) previous successful experience teaching ESL; (b) a minimum of 30 hours of District in-service training in ESL methodology with the understanding that outside training *709 can be credited toward 10 of these hours; (c) obtaining a passing grade on a test of ESL theory and methodology that was (i) developed by a consultant to the District who is an ESL expert, and (ii) reviewed for reliability and validity and approved by the SDE; and (d) a satisfactory score on an observation of the teacher's classroom performance. The observation of all such teachers was scheduled to be held in the Fall of 1988, and was to be conducted by expert evaluators from the San Francisco Unified School District. The District places great emphasis on prior successful ESL teaching experience.
104. At the secondary level, the curriculum is more complex. The secondary ESL teachers have had past ESL teaching experience and have received in-service training.
105. California law requires academic content high school courses to be taught by teachers who are credentialed in the subject matter.
106. In these high school classes, students whose English proficiency is more limited are assigned to small classrooms where academic subjects are taught by a teacher who has received 30 hours of in-service training on ESL and sheltered techniques, who has passed an objective examination, and who has experience in working with students with special needs.
107. At the high school, there are English language development specialists who teach English skills classes specifically designed to correspond to the ESL class level of individual LEP students.
108. The District has hired ESL teachers who lack special certification on alternative grounds when credentialed ESL teachers for particular openings were unavailable.
109. The District could not hire bilingual credentialed teachers in some instances because such teachers were unavailable for the jobs then open.
110. The District's policy has been to recruit and hire fully credentialed Spanish bilingual teachers.
111. When a non-credentialed teacher was hired for a Spanish bilingual opening by the District, he or she was required to demonstrate competence in Spanish language and bilingual methodologies and was required thereafter to make substantial progress toward completion of the bilingual credential as a condition of continued employment.
112. When the District hired an interim bilingual teacher, that is, one who does not have a bilingual teaching credential, the teacher was assigned to teach only the English language and ESL portions of the Spanish bilingual program.
113. The BUSD students who are LEP have been taught effectively in English by a teacher who speaks only English.
114. Measures of achievement of the District LEP students in the Spanish bilingual program do not appear to be related to whether the teacher was or was not a certified teacher.
115. The skills that a qualified ESL teacher should have are a knowledge of English, the language that is being taught, and an appreciation or understanding of how languages are learned.
116. A good teacher should be endowed with sensitivity, the ability to work hard, a love of children, and a love of the subject matter. These also are some of the qualities, among others, that a good ESL teacher should possess.
117. The District's 30-hour in-service ESL training program can be effective in providing teachers ESL skills.
118. Teachers of LEP children depend upon a strong background in liberal arts, the ability to be a good speaker of English, and where possible, some knowledge of the student's native language.
119. Characteristics of teaching excellence are common to all effective teachers whether their students are LEP students or not.

L. The District's Tutors

120. The District uses tutors to assist in delivery of educational services and, at the time of trial, had tutors who speak 11 of *710 the 38 non-English languages represented in the Berkeley schools.
121. The District tries to hire academic tutors who possess a bachelor of arts degree, or 2 years of college and 2 years of full-time work experience as a tutor or other remedial instructional assistant.
122. Tutors participate in the District's in-service training which includes training in ESL methodology.
123. At the elementary level, the tutors' work with LEP students is supervised by the regular classroom teacher and by the principal at the school site.
124. At the secondary level in Berkeley, the role of the tutor is to provide academic assistance by working in the classroom with teachers, monitoring students, working in ESL tutorials, and coaching students in academic and language acquisition.

M. Testimony of Expert Witnesses

125. A comparison of grades assigned to BUSD LEP and non-LEP students shows that:
In eight of nine grade levels, the mathematics report card grades for LEP students in Berkeley were similar to the report card grades earned by regular students.
In five of nine grade levels in reading or English, the LEP students in Berkeley displayed report card grades that were equal to or above report card grades earned by regular students.
In all of 18 reading or English and math content areas for all grade levels, LEP students in Berkeley earned report card grades equal to or greater than those of regular students in 13 of the 18 different content area comparisons.
126. The BUSD LEP students increased their test scores from pre-reclassification for exit from the District's special language services to post-reclassification, with average increases in CTBS reading, language and math scores of 20 to 30 points.
127. From the Fall of 1986 to the Fall of 1987, all students in grades kindergarten through 12, who were enrolled in the District's special language programs, had an average increase of 1.41, on a scale of 1 through 7, in their oral English proficiency skills as measured by the IPT.
128. CTBS scores 2 years before reclassification compared to scores two years after reclassification of former LEP students in Berkeley showed that English language scores went from the middle 40s up to the low 70s, and English reading scores increased from the middle 30s up to the middle 60s. Math scores went from 60 to 70 up to 70 to 80.
129. A comparison of BUSD LEP student California Achievement Profile (CAP) scores with two other school districts, that are generally known to have effective programs for LEP students, shows that there is no significant difference between the reading achievement of LEP students in Berkeley in comparison to those districts (Fremont and San Jose), and Berkeley LEP students have significantly higher math achievement.
130. A comparison of CAP scores for selected school districts with the District's CAP scores for LEP students in grades 3 and 6 shows that:
In grade 3 the reading and mathematics test scores for the LEP students at Washington School were higher than the LEP scores at all of the schools reviewed in this study.
In grade 6 the reading test score for the LEP students at Malcolm X School was higher than the LEP scores in seven of the 11 schools cited.
In grade 6 the mathematics test score for the LEP students at Malcolm X School was higher than LEP scores in eight of the 11 schools cited.
131. A comparison of the academic achievement of LEP students in the ESL-ILP and the Spanish bilingual programs, shows no significant difference in achievement between LEP students in those programs.
132. The District designs its regular instructional program so as to afford equal access and equal educational opportunity for racial minority children and students with special needs, including LEP students. *711 The District has implemented several institutional changes such as voluntary desegregation involving cross-town busing of children, elimination of tracking, elimination of ability grouping, and the adoption of a cross-cultural curriculum. The District's teachers have received in-service training on instructional methods and techniques thought to be effective in improving minority student academic achievement.
133. Although it can be helpful at times to have a teacher or tutor who speaks the native language of the student, academic achievement is attainable without that ability. The evidence supports a conclusion that the District's ESL program has been delivered effectively by English-speaking teachers and tutors.
134. The District commissioned a survey of parents of LEP students in grades 1 through 6 in which 81% of those parents responded to the survey.
135. The survey showed that parent satisfaction with their children's education in Berkeley was very high.
136. Fifty-four percent of the parents of Berkeley's LEP children in grades 1 through 6 were "very satisfied" and another 33% were "satisfied." Only 11% were either "somewhat dissatisfied" or "very dissatisfied" and 2% were "not sure." While Hispanics favored the bilingual model of instruction by a margin of 2 to 1, Asians and others favored the ESL-ILP program by a margin of about 2 to 1.
137. Parents who had children in the bilingual programs quite frequently cited "the maintenance of the primary language" as an important reason for having their children in the program. The next most frequent reason given was "to foster a learning of the Hispanic culture."
138. Dr. Thomas Scovel, a linguist from California State University at San Francisco, observed the District's classroom teachers and compared them to other teachers in other schools that he had observed. He rated the program in Berkeley as "good," and its teaching staff as highly competent.
139. Witnesses qualified as educational experts testified for the District and in each case the witness had visited the Berkeley schools before testifying and had first-hand knowledge of the District's special language programs.
140. Expert opinion presented by District witnesses based upon their personal observations of schools, teachers, administrators, classes, and students, supports the conclusion that the District's special language services were based upon sound theories, were appropriately implemented, and produced positive results in teaching LEP students.

N. Results of the District's Special Language Services

141. The District's LEP students are making reasonable gains in obtaining proficiency in English and mastering academic subjects. For the most part, they are performing at grade level in math, and making expected progress in English language skills.
142. The math and English reading achievement test scores of the District's LEP students compare favorably to the achievement test scores of LEP students in other school districts with programs of special language services.
143. Based on standardized test scores and grades, the achievement records of Berkeley's LEP students establish that they are deriving significant, ongoing educational benefits from the District's programs and are competing favorably with native English speakers. These test scores and grades show that the District's LEP students are learning at rates equal to, and in some cases greater than, their counterparts, countywide and statewide.
144. The District's LEP students have better than average attendance records. This tends to show that the LEP students in Berkeley are participating fully in the Berkeley educational program.
145. The evidence of LEP student achievement indicates that Berkeley LEP students are learning English and participating successfully in the District's regular curriculum.
*712 146. The structure and design of the District's elementary ESL program is based upon factors that include: diversity of language backgrounds; adherence to parental preferences, where possible, either for placement in regular mainstream classrooms, the ESL program, or in bilingual classrooms; and school district educational policies that foster integration and heterogeneity.
147. The testimony of the District's principals and classroom teachers established their consensus judgment, from direct observation, that Berkeley's LEP students are in fact learning English and academic content matter.
148. At Berkeley High School, LEP students are passing high school proficiency examinations in English writing, reading, and math at a satisfactory rate. When they achieve fluent English proficiency and exit the ESL program, these former LEP students appear to have sufficient English skills to participate successfully in the regular program. In general, Berkeley LEP students score consistently higher than the Alameda County and the state-wide averages on academic achievement tests.
149. The District's ESL and Sheltered English programs are appropriately designed and based upon educationally acceptable theory.
150. The record amply demonstrates that the District's special language programs for LEP students are implemented in a manner which provides sound, essentially effective, programs for teaching English and academic subjects.

III. CONCLUSIONS OF LAW
Plaintiffs challenge the Language Remediation Program of the Berkeley Unified School District (BUSD) on two grounds. First, plaintiffs argue that the BUSD violated section 1703(f) of the Equal Educational Opportunity Act (EEOA), 20 U.S.C. § 1701 et seq., which requires appropriate action by school districts to overcome special educational barriers. Second, plaintiffs allege that the BUSD violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which prohibits racial discrimination in programs receiving federal aid. As relief, plaintiffs request that the Court issue an injunction ordering the BUSD to design and implement a comprehensive plan to ensure plaintiffs equal educational opportunity and effective participation in the learning process.
Based on the findings of fact and a review of the applicable law, this Court concludes that plaintiffs have failed to establish a violation of either section 1703(f) or Title VI.

A. Plaintiffs' EEOA Section 1703(f) Claim

1. Legal Framework
Plaintiffs first cause of action is based on section 1703(f) of the EEOA, which provides that:
No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by 
(f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.
20 U.S.C. § 1703(f) (emphasis added).
The EEOA does not define appropriate action nor does it provide criteria for a court to evaluate whether or not a school district has taken "appropriate action." There are no Ninth Circuit cases which establish a legal framework for assessing whether or not a particular language remediation program constitutes appropriate action. Although the Ninth Circuit in Guadalupe v. Tempe Elementary School District No. 3, 587 F.2d 1022, 1030 (9th Cir.1978), held that appropriate action need not include bilingual-bicultural education, the court did not further articulate appropriate action criteria to be used.
The clearest statement of this requirement is set forth by the Fifth Circuit in Castaneda v. Pickard, 648 F.2d 989 (5th Cir.1981). Castaneda held that in evaluating a school system's language remediation program, a court must conduct the following three-prong analysis.
*713 First, the court must determine whether the school district is pursuing a program "informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy." Id. at 1009. Second, the court must establish whether "the programs and practices actually used by the school system are reasonably calculated to implement effectively the educational theory adopted by the school." Id. at 1010. Third, the court must determine whether the school's program, although premised on sound educational theory and effectively implemented, "produces results indicating that the language barriers confronting students are actually being overcome." Id.
Several other courts have adopted this approach,[1] and plaintiffs urge this Court to follow their lead.
Although this Court is not bound by the Castaneda three-prong approach, the decision does provide the Court with useful criteria to be used in the review of appropriate action issues. As the Seventh Circuit in Gomez v. Illinois State Board of Education, 811 F.2d 1030, 1041 (7th Cir. 1987) noted, the Castaneda guidelines require fine tuning, but nonetheless provide a helpful analytic structure.
This Court agrees with, and will heed, the warnings stated by the Castaneda Court itself that courts should not substitute their educational values and theories for the educational and political decisions properly reserved to local school authorities and the expert knowledge of educators, since they are ill-equipped to do so. Id. at 1009.

2. Discussion
Plaintiffs contend that the BUSD has failed to take appropriate action to overcome the language barriers faced by its LEP students. Specifically, plaintiffs challenge the BUSDs alternative to bilingual education, which is an ESL-ILP program at the elementary level and ESL classes and a Sheltered English program at the secondary level. Plaintiffs do not challenge the BUSDs Spanish bilingual or Jefferson Asian bilingual programs.
Relying on Castaneda, plaintiffs maintain that the BUSD remedial language program violates section 1703(f) of the EEOA. They claim that even if the program rests on a pedagogically sound basis its implementation violates the appropriate action standard of the EEOA. Plaintiffs argue that by failing to provide qualified teachers, sufficient supporting resources, and necessary monitoring systems, the BUSD has violated the EEOA. Plaintiffs also argue that the procedures utilized by the BUSD to identify, place, and exit students from the special language services program, violate the EEOA.

a. Sound Educational Theory

The EEOA does not require school districts to adopt a specific educational theory or implement an ideal academic program. That Congress utilized the term "appropriate action," rather than "bilingual education," indicates that Congress intended to leave educational authorities substantial latitude in formulating programs to meet their EEOA obligations. Castaneda, 648 F.2d at 1009.
Given the diversity of opinion in the education field concerning which theoretical and programmatic approach is sound, it is fortunate that this Court is not charged with the difficult task of establishing the ideal program or choosing between competing theories. Instead, this Court is charged solely with the responsibility of determining whether the BUSDs program is informed by an educational theory which some experts recognize as sound. After reviewing the evidence presented in this case, this Court concludes that the plaintiffs have not met their burden to show that the BUSD program is not pedagogically sound. In fact, the evidence shows that the educational theories, upon which the BUSDs programs are grounded, are manifestly as sound as any theory identified by plaintiffs.
*714 Although plaintiffs advocate a program that emphasizes native tongue instruction, they introduced no objective evidence demonstrating that the efficacy of this approach, whatever it may be, for teaching LEP students English, or helping them succeed in a mainstream environment, renders the alternative programs preferred by BUSD pedagogically unsound.

b. Implementation of the Educational Program

(1) Effective Teachers
Plaintiffs maintain that the training of the bilingual teacher and tutor is crucial to the proper implementation of a language remediation program. Plaintiffs argue that by failing to hire teachers and tutors qualified to provide the highly technical and specialized instruction required by the ESL approach, the BUSD has failed to implement a sound educational program.
Plaintiffs contend that in order to implement its language remediation program, BUSDs teachers must have skills based on academic course work in ESL methodology, the developmental needs of LEP students, language proficiency assessment procedures, applied linguistics, general language acquisition, and second language acquisition. Plaintiffs contend that the BUSD should assure this competence by hiring teachers with a language development specialist credential, a bilingual-crosscultural certificate of proficiency or a bilingual-crosscultural specialist credential.
Plaintiffs further argue that in order to effectively deliver ESL instruction, the tutors and paraprofessionals hired by the BUSD must also possess a certificate or credential indicating that they possess the necessary skills and educational background.
By including in the EEOA the obligation to remove language barriers through appropriate action, Congress intended to ensure that school districts make "genuine and good faith efforts, consistent with local circumstances and resources," to remedy the language deficiencies of their LEP students. Castaneda, 648 F.2d at 1009. To this end, a school district that chooses to fulfill its EEOA obligations by means of a bilingual program must make good faith efforts to provide teachers competent to teach such a program. Id. at 1012. However, as Castaneda makes clear, the question of whether a school district has in good faith attempted to implement such a program must be tested against reality.
Based on the record in this case, this Court concludes that plaintiffs have failed to meet their burden to show that the actual programs and practices are not reasonably calculated to effectively implement the educational theories upon which an overall program is premised. The BUSD has not violated the EEOA by a failed implementation effort.
The threshold question is, of course, whether or not the credentialed teachers contemplated by plaintiffs are in fact available to a school district who seeks them out. The evidence at trial did not fully resolve this issue but did suggest that it is highly unlikely that the BUSD could fill all necessary positions with fully credentialed teachers in the basic language groups and that it is impossible to cover all languages represented in the BUSD school population. The record in this case established that the mix of teachers newly hired or reassigned to language remediation responsibilities by the BUSD, included both credentialed and non-credentialed teachers. Those without credentials were assessed as to relevant bilingual skills, required to participate in district level training sessions, and to make substantial progress toward completion of requirements for credentials as a condition of employment. The situation with tutors was much the same. The BUSD looks to college graduates or students with two years college at a minimum, finds some with native language ability, and provides relevant district level training to all.
The other major assumption of plaintiffs in this area is that it is necessary to hold language-specific credentials in order to deliver remediation programs which do not violate the EEOA. The evidence in the record does not support this assumption. Rather, it tends to show an alternative assumption: that good teachers are *715 good teachers no matter what the educational challenge may be. There is in fact evidence in the record showing that there is no difference in achievement success of LEP students in the BUSD between students with credentialed teachers and students who do not have credentialed teachers.
Finally, any review of the actual complement of teachers and the support provided them must be done in light of the resources actually available to the BUSD. The fact that the BUSD was nearly bankrupt in 1986 simply underscores the reality that the BUSD does not have unlimited funds and that program delivery by the BUSD in all areas is conditioned upon that fact.
Even though funds are limited, the evidence in this case shows that the BUSD has committed significant funds to language remediation program delivery and further that the actual delivery of those programs as to qualified teachers, supporting resources, and program monitoring, does not violate the EEOA on grounds of ineffective implementation.

(2) Testing Procedures
Plaintiffs claim that the BUSD has not effectively implemented its language remediation programs also contains the argument that the procedures utilized by the BUSD to identify, place, and exit LEP students from such programs violates the EEOA. In particular, plaintiffs argue that the use of a so-called TEPL exam does not provide an appropriate basis to determine whether a student is limited English proficient because the test is normed upon the English language skills of LEP students rather than those of native English-speaking students. Plaintiffs argue that the TEPL test does not permit an accurate assessment of the chances for the academic survival of an LEP student in a mainstream English speaking environment.
The TEPL test is but one of the more formal devices used by the BUSD in initial identification and continuing delivery of services to LEP students, a continuing process which also relies heavily, as it should, on classroom teacher assessment. As to the TEPL test itself, the evidence indicates that LEP students tested as fluent in the 1986-87 and 1987-88 TEPL tests and were in fact successful in the regular English program. Moreover, upon consideration of the evidence as a whole, while it is apparent that the identification process is imprecise, it is surely not so flawed that it defeats the effectiveness of language remediation program delivery.

c. Success of the Program

The third prong of the Castaneda test involves consideration of the program's results. Neither the EEOA nor the Castaneda court explains how it is that a federal court is to judge the results of a school district's language remediation program. Castaneda simply indicated that the program should "produce results indicating that the language barriers confronting students are actually being overcome." 648 F.2d at 1010.
Measuring the success or failure of educational programs is one of the great challenges that faces our educators and is a challenge that this Court approaches with, at least, great trepidation. Other courts have also expressed a similar reluctance. See e.g., Keyes v. School District No. 1, Denver, Colorado, 576 F.Supp. 1503 (D.Colo.1983). It is surely beyond the competence of this Court to fashion its own measure of academic achievement, and the Court will necessarily defer to the measuring devices already used by the school system.
In this case, the CAP and CTBS standardized achievement scores, used by California schools, relative to English and to academic subject matter, as well as the classroom grades of the BUSDs LEP students, all point to the effectiveness of the program in teaching English to LEP students and in contributing to their academic achievement.[2] These scores show that the BUSDs LEP students are learning at rates *716 equal to or higher than their counterparts in California. LEP students in the BUSD have a record of achievement which is the same or better than the record of LEP students in schools identified by plaintiffs' experts as having effective language remediation programs. Extremely strong attendance patterns provide further proof, through non-academic criteria, that LEP students are fully participating in the BUSDs educational program.
Recognizing the difficulties inherent in measurement it is nevertheless true that the best evidence of a sound and effectively implemented program lies in the results that it achieves. The overwhelming weight of evidence in this case establishes that the special language programs of the BUSD assure equal educational opportunity for LEP students and are effective in removing the language barriers faced by the LEP students.
Plaintiffs' claim that the BUSD has failed to implement a sound educational program, has not been sustained. Accordingly, this Court concludes that plaintiffs have failed to establish a violation of section 1703(f) of the EEOA.

B. Plaintiffs' Title VI Claim

1. Legal Framework
Plaintiffs' second claim for relief is based on Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and its implementing administrative regulations. Section 601 of the Act provides that:
No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.
42 U.S.C. § 2000d.
Regulations issued under this statutory mandate require that recipients of federal funding may not:
utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.
34 C.F.R. § 100.3(b)(2), originally adopted as 45 C.F.R. § 80.3(b)(2).
In Guardians Ass'n v. Civil Service Comm. of New York, 463 U.S. 582, 103 S.Ct. 3221, 3237, 77 L.Ed.2d 866 (1983), a majority of the Supreme Court held that a violation of Title VI requires proof of discriminatory intent. A different majority held, however, that under the regulations to Title VI, proof of discriminatory effect may suffice to establish liability. Id. 103 S.Ct. at 3235 n. 1. The Court in Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974), previously held that discrimination which had the effect of depriving students equal educational opportunity was barred by section 601, even if no purposeful design is present. The Ninth Circuit has expressly followed Lau. Larry P. v. Riles, 793 F.2d 969, 981 (9th Cir.1984); Guadelupe Organization v. Tempe Elementary School, 587 F.2d 1022, 1029 (9th Cir.1978); De La Cruz v. Tormey, 582 F.2d 45, 61 n. 16 (9th Cir.1978), cert. denied, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979).

2. Discussion
The case law makes clear that in order to establish a prima facie case of discrimination, plaintiffs must show a discriminatory intent on the part of the BUSD or show that the BUSDs language remediation program, although neutral on its face, has a discriminatory effect on the BUSDs LEP students. Plaintiffs have not offered evidence and in fact do not argue that the BUSD harbors any racially discriminatory intent whatsoever in the delivery of any of its educational programs. Proof that the BUSDs program has a disparate impact on LEP students is, therefore, the only avenue that remains open to them to establish that the BUSD violates Title VI.
Plaintiffs, however, disagree. Plaintiffs argue that a disparate impact analysis is not required in this case and claim that a *717 Title VI violation can be established simply by identifying the programs of the BUSD and the delivery in fact of those programs and establishing racial discrimination by a process of logical inference. This Court disagrees. Although there are relatively few Title VI disparate impact cases, the cases that do exist all hold that plaintiff can only establish a prima facie case by offering proof of discriminatory intent or proof that the challenged action has a discriminatory impact.
For example, in Larry P., the Ninth Circuit considered whether tests used to place students in educationally mentally retarded (EMR) classes operated with discriminatory effect. Although the court found that the placement tests violated Title VI, the court reached this conclusion only after plaintiffs established a prima facie case of detrimental impact with statistical evidence that a disproportionate number of Black students were being placed in EMR classes. 793 F.2d at 982.
Since plaintiffs in this case have not offered any evidence, statistical or otherwise, of racially discriminatory effect, this Court concludes that plaintiffs have utterly failed to sustain their burden of proof under Title VI.

IV. CONCLUSION
Based on these findings of fact and conclusions of law, this Court holds that plaintiffs have failed to establish a violation of section 1703(f) of the EEOA or section 601 of Title VI. Accordingly, this Court enters judgment in favor of defendants.
IT IS SO ORDERED.
NOTES
[1] See e.g., Gomez v. Illinois State Board of Education, 811 F.2d 1030, 1041 (7th Cir.1987); Keyes v. School District No. 1, Denver, Colorado, 576 F.Supp. 1503, 1510 (D.Colo.1983).
[2] In considering comparative test scores, this Court is mindful that these scores are often affected by a host of variables such as socio-economic status and individual characteristics of the child.