Miriam **FLORES,** individually and as a parent of Miriam Flores, a minor child, et. al., Plaintiffs,

v.

State of **ARIZONA,** et. al., Defendants.

No. Civ. 92–596 TUC ACM.

United States District Court, D. Arizona.

April 14, 1999.

Fed.R. of Civ.P. 15.

Roger W. Hall, Assistant Attorney General, Phoenix, Arizona, for State of Arizona, defendant.

## ORDER

MARQUEZ, Senior District Judge.

*Background*

August 20, 1992, Plaintiffs filed this action seeking declaratory relief against the Defendants for failing to provide limited English proficient (LEP) children with a program of instruction calculated to make them proficient in speaking, understanding, reading, and writing English, while enabling them to master the standard academic curriculum as required of all students. *See Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (failure to provide English instruction to students of Chinese decent who do not speak English denies them a meaningful opportunity to participate in public education and violates Title VI, 42 U.S.C. § 2000d). Plaintiffs further challenge the Defendants' funding, administration and oversight of the public school system in districts enrolling predominantly low-income minority children because Defendants allow these schools to provide less educational benefits and opportunities than those available to students who attend predominantly anglo-schools.

Plaintiffs allege that the Defendants violate the Equal Education Act of 1974 (EEOA), (Title 20 U.S.C. § 1703(f)),[1] and the implementing regulations, (34 C.F.R. Part 100), for Title VI of the Civil Rights Act of 1964 (Title VI), (42 U.S.C. § 2000d).[2] Plaintiffs seek relief against all the Defendants, except the State of Arizona, under 42 U.S.C. § 1983 which pro-

Tim Hogan, Arizona Center For Law In the Public Interest, Phoenix, Arizona, for Miriam Flores, plaintiff.

---

**1.** The EEOA provides as follows:

No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—
(f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

20 U.S.C. § 1703.

**2.** Title VI provides as follows:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

vides "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..."

■ The Eleventh Amendment of the Constitution shields the State with immunity from § 1983 actions. A suit against a state official, in his official capacity, is tantamount to a suit against the state itself and is likewise barred except as recognized in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), where the Supreme Court held that a state official who acts unconstitutionally can be sued in his official capacity for prospective injunctive relief. Such a suit does not affect the State in its sovereign or governmental capacity because the official who commits an unconstitutional act is deemed "stripped of his official or representative character...." *Id.* at 159–60, 28 S.Ct. 441.

■ Alternatively, Plaintiffs may proceed against all Defendants under the EEOA and Title VI. There is no 11th Amendment immunity for the State from Title VI and EEOA actions. *See: Los Angeles NAACP v. Los Angeles Unified School District, et. al.,* 714 F.2d 946, 950 (9th Cir.1983) (by enacting the EEOA, 20 U.S.C. § 1703, Congress, acting pursuant to its enforcement powers under § 5 of the 14th Amendment, abrogated 11th Amendment immunity of state educational agencies (State Department of Education and State Board of Education)), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984); *Gomez v. Illinois State Board of Education,* 811 F.2d 1030, 1035–1038 (7th Cir.1987) (pursuant to § 5 of 14th Amendment, Congress abrogated 11th Amendment immunity for EEOA cases by enacting 20 U.S.C. § 1706, providing a private right of action); *Clark v. California,* 123 F.3d 1267, 1270 (9th Cir.1997) (42 U.S.C. § 2000d–7(a)(1)) explicitly states, "a State shall not be immune under the 11th Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, 2000d–7(a)(1) applies equally to Title VI; 42 U.S.C. § 2000d–7(a)(1) expresses clear intent of Congress to condition grant of federal funds on State's consent to waive its constitutional immunity"), *cert. denied, Wilson v. Armstrong,* —— U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *Ass'n of Mexican–American Educators v. California,* 836 F.Supp. 1534, 1540–1543 (N.D.Cal.1993) (State may be sued for Title VI violation, 42 U.S.C. § 2000d–7(a)(1)) abrogates 11th Amendment immunity); *Board of Public Education for City of Savannah and County of Chatham v. Georgia,* 1990 WL 608208 (S.D.Ga.1990) (citing *Gomez,* 811 F.2d 1030 holding that 42 U.S.C. § 2000d–7, Congress specifically abrogated states' immunity from Title VI suits).

There is an express private right of action under the EEOA. 20 U.S.C. § 1706. *Los Angeles NAACP v. Los Angeles Unified School District, et. al.,* 714 F.2d 946, 950 (9th Cir.1983), *cert. denied, California v. NAACP,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984); *Gomez,* 811 F.2d at 1035–1038. For purposes of § 1703(f), an educational agency is defined as a "a local educational agency or a 'State educational agency,'" *NAACP,* 714 F.2d at 950 (citing 20 U.S.C. § 1720), "... the term 'State educational agency' means the State board of education or other agency or officer primarily responsible for the State supervision of public elementary and secondary schools," *id.* (citing 20 U.S.C. § 3381(k)). Section 1706 permits an "individual denied an equal educational opportunity, as defined by this subchapter, [to] institute a civil action in an appropriate district court of the United States against such parties, and for such relief as may be appropriate." *Id.*

■ There is an implied private right of action to enforce Title VI, 42 U.S.C. § 2000d. *Cannon v. University of Chicago*, 441 U.S. 677, 696–703, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Congress intended to create Title IX remedies comparable to those available under Title VI and it understood that Title VI authorizes an implied private cause of action for victims of prohibited discrimination); *see also Clark*, 123 F.3d at 1270 (42 U.S.C. § 2000d–7(a)(1) expresses clear intent of Congress to condition grant of federal funds on State's consent to waive its constitutional immunity). To prevail solely under Title VI, however, Plaintiffs must prove discriminatory intent. *See Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 287, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (discriminatory animus essential element of a claim based on Title VI alone; overturning *Lau's* contrary holding); *see also Guardians Ass'n. v. Civil Service Comm'n.*, 463 U.S. 582, 610–612, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (*Lau's* contrary holding did not survive *Bakke* ) (Powell, J., concurring in the judgment), *id.*, at 612, 103 S.Ct. 3221 (O'Connor. J. Concurring in the judgment), *id.*, 639–42, 103 S.Ct. 3221 (Stevens dissenting).

■ Here, Plaintiffs do not allege discriminatory intent. Instead they proceed under Title VI regulatory provisions, 34 C.F.R. Part 100. Plaintiffs seek this path because the regulations, unlike the statute, reach disparate impact claims. *See Ass'n of Mexican–American Educators*, 836 F.Supp. at 1540–1543 (Title VI regulations prohibit the use of federal funds for programs that are discriminatory in effect, though not in purpose). The Supreme Court has concluded that Title VI regulations are valid, and that a disparate impact claim may be brought for declaratory and limited injunctive relief. *See Alexander v. Choate*, 469 U.S. 287, 293, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (majority of the Court in *Guardians*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), concluded that actions having an unjustifiable disparate im-

pact on minorities could be redressed through agency regulations designed to implement purposes of Title VI). The Court has not, however, specifically ruled that there is a private right of action to enforce the regulations.

■ "The Ninth Circuit applies a two-part test to determine whether agency regulations give rise to a private right of action: '(1) whether Congress delegated authority to establish rules implying a private right of action; and (2) whether the rule in question was drafted such that [a] private right of action may legitimately be implied.' " *Ass'n of Mexican–American Educators*, 836 F.Supp. at 1547 (citing *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984)). In the case of Title VI, the authority for the implementing regulations appears on the face of the statute: "Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity ... is authorized and directed to effectuate the provisions of [Title VI] by issuing rules, regulations, or orders of general applicability...." *Id.* (citing 42 U.S.C. § 2000d–1).

■ The second-prong of the test requires this Court to make the following sequential findings:

[I]f the rule in question is valid and [if it] furthers the substantive purposes of the enabling statute, and [if] the statute provides a private right of action as a matter of congressional intent, [the court] will imply the private right of action into the rule as well, regardless of agency intent.

*Id.* (citing *Robertson*, 749 F.2d at 536, accord *Polaroid Corp. v. Disney*, 862 F.2d 987, 994 (3rd Cir.1988)). As the court in *Ass'n of Mexican–American Educators* concluded, "all three of these requirements are satisfied:" the Supreme Court has held that the Title VI regulations are valid and that they further the congressional purpose of withholding federal funds from discriminatory practices, *id.* (citing *Guard-*

*ians,* 463 U.S. at 591–93, 103 S.Ct. 3221 (opinion of White, J.)), and the majority of the Court has concluded that there is a private right of action under Title VI, *id.* (citing *Guardians,* 463 U.S. at 594, 103 S.Ct. 3221).

Accordingly, this Court finds that Plaintiffs may proceed against all Defendants, including the State, for violations of the EEOA and Title VI's implementing regulations, 34 C.F.R. Part 100. This conclusion is important because the law governing Plaintiffs' claims has changed since Plaintiffs filed their Complaint, primarily relying on 42 U.S.C. § 1983. In 1997, the Supreme Court ruled in *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), that Plaintiffs must articulate with particularity the rights they seek to enforce under 42 U.S.C. § 1983. Courts cannot paint with too broad a brush or take a blanket approach when determining whether a statute like Title VI gives rise to a private, enforceable right. *Id.* at 1360–61. *Blessing* forces Plaintiffs to break down their claims into "manageable analytic bites" so that the Court can "ascertain whether each separate claim satisfies the various criteria [the Supreme Court has] set forth for determining whether a federal statute creates rights." *Id.* at 1360. For example, Plaintiffs in *Blessing* charged that the staffing levels at Arizona's child support agency were inadequate to recover unpaid child support payments as required under Title IV–D; according to the Supreme Court, neither the statutory nor regulatory provisions requiring the agency to have "sufficient staff to fulfill specified functions" gave rise to federal rights. *Id.* at 1361–62. The link between staffing levels and the services provided to any particular individual is too tenuous to support the notion that Congress meant to give each and every Arizonan who is eligible for Title IV–D benefits, the right to have the agency staffed at a "sufficient" level, especially when neither statute nor regulation provides any guidance as to how large a staff would be "sufficient." *Id.*

■ Here, Plaintiffs' Second Amended Complaint fails to identify with any specificity the statutory or regulatory provisions which Plaintiffs seek to enforce, but charges broadly that Plaintiffs' rights under the EEOA and Title VI regulations, 34 C.F.R. part 100, have been violated. *See Blessing,* 117 S.Ct. at 1362 (rejecting Title IV–D claim seeking declaration that their rights were violated and an injunction forcing Arizona's child support agency to substantially comply with all provisions of Title IV–D). Thereafter, the Court applies the following traditional three factors for determining whether any proffered provision gives rise to a federal right:

> First, Congress must have intended that the provision in question benefit the plaintiff. (citation omitted) Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. (citation omitted) Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Blessing,* 117 S.Ct. at 1359–60 (citations omitted).

■ If Plaintiffs demonstrate that a provision creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. *Id.* "Because our inquiry focuses on congressional intent, dismissal is proper if Congress 'specifically foreclosed a remedy under § 1983.'" *Id.* (citation omitted). "Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (citation omitted).

The Court finds no purpose in further delaying this case to require Plaintiffs to once again amend the Complaint to better

state the § 1983 claim. Plaintiffs' *Lau* claim can be brought under the EEOA and under 34 C.F.R. Part 100 of the Title VI regulations. Plaintiffs' disparate impact claim that the State's school system affords children attending schools in predominantly minority districts less educational benefits and opportunities then students who attend predominantly anglo-schools is also actionable under Title VI. The old-age of this case factors into this Court's decision to dismiss the § 1983 claim, without leave to amend.

Furthermore, unless the parties proceed without any further delays in the adjudication of this case, the Court shall dismiss the entire action based on its dilatory procedural history. Initially when Plaintiffs filed the Complaint in August 20, 1992, Defendants sought dismissal under Fed. R.Civ.P. 8(a). The Court granted the motion because the pleading failed to contain a short and plain statement showing that the pleader was entitled to relief, and on May 26, 1993, the Court dismissed the Complaint with leave to Amend. Plaintiffs filed the Amended Complaint on June 23, 1993.

Shortly thereafter, Defendants filed a Motion to Dismiss arguing as follows: 1) they had fulfilled all statutory obligations under 20 U.S.C. § 1703(f) and, therefore, Plaintiffs failed to state a claim under 42 U.S.C. § 1983; 2) the State's financing system cannot be a basis for finding discriminatory intent if it is fair on its face; 3) Plaintiffs failed to show that there was any exclusion from participation in or discrimination under any program or activity and, therefore, failed to state a claim under 42 U.S.C. § 2000(d), and 4) Plaintiffs' claims were properly being litigated in the state forum by *Roosevelt Elementary School District No. 66, et al. v. C. Diane Bishop,* (*Roosevelt I* ) 179 Ariz. 233, 877 P.2d 806 (1994) (en banc); *Roosevelt Elementary School District No. 66, et al. v. C. Diane Bishop,* (*Roosevelt I* ) 179 Ariz. 233, 877 P.2d 806 (1994) (en banc), *appeal after remand, Hull v. Albrecht,* (*Roosevelt II* ) 190 Ariz. 520, 950 P.2d 1141 (1997), *appeal after remand,* (*Roosevelt III* ) 192 Ariz. 34, 960 P.2d 634 (1998).

This Court treated the Motion to Dismiss as a Motion for Summary Judgment, and on July 14, 1994, denied the Defendants' motion. The Court also certified the case as a class action. The Court held a scheduling conference, and issued a scheduling Order on October 6, 1994, setting the following dates: discovery due July 1, 1995; dispositive motions due August 1, 1995; pretrial order due September 1, 1995, and final pretrial conference on September 11, 1995. Over the next two years, the parties required repeated extensions of the deadlines for various reasons, but primarily because of staff changes at either the State Department of Education or the State Attorney General's office. Plaintiffs' counsel also had to withdraw for a time because Congress passed Public law 104–134 which prohibited publicly funded legal-aid organizations from bringing actions against the government. In 1996, Defendants filed a Motion for Summary Judgment and a motion challenging the Court's certification of Plaintiffs' class.

On August 9, 1996, this Court ruled on Defendants' motions. The Court denied the Defendants' Motion for Summary Judgment which had argued that there was no private right of action enforceable by § 1983 under the statutory and regulatory provisions relied on by Plaintiffs: 20 U.S.C. § 1703(f), 42 U.S.C. § 2000d, and 34 C.F.R. part 100 *et seq.* The Court rejected Defendants' argument that Plaintiffs could not be party representatives because they were doing well in school and, therefore, had not been injured by the State's challenged LEP programs. The Court reasoned that making good grades only becomes meaningful if testing standards applied in these schools are comparable to testing standards for the average student statewide. In other words, this was a material issue of fact relevant to the issue of whether all children in the Arizona public schools are achieving mastery of the

same specified "essential skills." The Court denied the Motion to Dismiss. The Court did, however, grant Defendants' Motion for Decertification because the named party plaintiffs were not representative of the class, for example one class representative was unaware of his status or the case and others were not LEP students. The Court's Order was without prejudice to Plaintiffs filing a motion to recertify the class.

On January 8, 1997, Plaintiffs filed a Second Amended Complaint naming new party representatives, all within the Nogales School district. The proposed class definition no longer included "children now or hereafter enrolled in DUSD (Douglas Unified School District)." (Amended Complaint filed June 22, 1993.) Over renewed objections from Defendants, the Court certified the class, defined as follows: "all minority 'at risk' and limited English proficient (LEP) children now or hereafter enrolled in Nogales Unified School as well as their parents and guardians." (Order filed August 28, 1997). The parties had still not completed discovery, so the Court ordered that within 30 days the parties were to complete discovery and that no further discovery extensions would be granted.

Nevertheless, on September 16, 1997, the parties filed a motion asking that the Court extend the deadlines by 120 days because they had not conducted discovery pending disposition of the class certification issue, but "barring any further delays," within 120 days they should conclude discovery and have the case fully prepared for adjudication by the Court. The Court granted the extension. On November 17, 1997, Defendants' attorney requested another small, approximately 30–day, extension for health reasons. The Court granted the extension. Discovery closed without incident, but the parties failed to comply with the deadline for filing the pretrial order and instead asked that the Court vacate the pretrial conference. The Court refused.

At what should have been the pretrial conference, the Court reset the deadline for filing the pretrial order to May 1, 1998, and reset the date for the pretrial conference to May 4, 1998. The Court formally closed all discovery with the exception of two depositions. The Court set a trial date of May 26, 1998. Plaintiffs' attorney asked for and was granted leave to file dispositive motions, which he asserted would not delay the trial and would narrow the issues for trial. The motions were not forthcoming, instead the parties filed a joint Motion for Reconsideration asking the Court to continue the trial date to sometime in July to accommodate for the school year because many of the witnesses are teachers or employees of the Arizona State Board of Education or the Arizona Department of Education. Many of the witnesses were also involved with the 1998 legislative review of the State's school financing system resulting from *Roosevelt.*

Again, the trial date was reset: July 27, 1998. Within 30 days of the trial date, on April 28, 1998, Plaintiffs filed their dispositive motions. Plaintiffs filed the following motions for partial summary judgment, all greatly in excess of the 15–page limit for motions: Motion for Partial Summary Judgment Re: Defendants' Authorization of Methods of Administering *Lau* Programs, Contrary to Federal Standards and Failure to Monitor Compliance with Such Standards as Required by Federal Law (MPSJ: *Lau* Oversight); Motion for Partial Summary Judgment Re: Failure to Adequately Underwrite District *Lau* Programs, as Required by Federal Law (MPSJ: *Lau* Funding), and Motion for Partial Summary Judgment on Non–*Lau* Claim Arising Under 34 C.F.R. Part 100 (MPSJ: 34 C.F.R. Part 100). While the Court was inclined to strike the motions as untimely, Plaintiffs asserted that the case would most likely be disposed of by these motions, so the Court granted Defendants an extended period of time to respond to the lengthy motions. Defendants only filed responses to two of the motions. Af-

ter being contacted by this Court, Defendants requested and were granted leave to file the third Response, late.

This Court is highly critical of the manner in which both parties have proceeded in this case. The Complaint was filed in 1992 and this case has crawled towards adjudication. Plaintiffs' last minute partial motions for summary judgment are untimely, and the sheer volume of the statement of facts, attendant expert-witness depositions, and other technical exhibits, strongly suggest material facts are in dispute. Defendants, however, do not similarly respond. They do not file controverting statement of facts nor expert witness opinions contrary to those submitted by Plaintiffs. Instead, Defendants argue that Plaintiffs fail to present any evidence connecting the alleged federal law violations to students in the Nogales school district. Alternatively, Defendants argue that the case is moot because of recent legislative changes in Arizona.

The Court considered granting Plaintiffs' motions for partial summary judgment because Defendants, the parties opposing the motion, cannot simply rest on allegation and denial but must present significant probative evidence contrary to the movants' assertions. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiffs, however, as the moving parties bear the initial burden of demonstrating by admissible evidence the absence of genuine issues of material fact. *Id.* The summary judgment inquiry mirrors the standard for a directed verdict: whether the party with the burden of proof has presented sufficient evidence that a jury could properly proceed to return a verdict for the burdened party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue of material fact and that the moving party is entitled to judgment as a matter of law. Consequently, Defendants can survive Plaintiffs' motions for partial summary judgment, if Plaintiffs failed to meet their initial burden of demonstrating the absence of genuine issues of material fact.

██ The Court is disappointed in this defense because the decision to allow the late filed dispositive motions in excess of the page limit **and to grant Defendants' request for an extension of time to respond** was based on the representation that the motions would most likely dispose of the case, or at the very least significantly narrow the issues for trial. Due in large part to Defendants' limited approach, the record is still inadequate for this Court to rule on the substantive issues of whether Defendants fail to provide adequately for the instruction of LEP students and other "at risk" students attending public school systems in districts like Nogales. Consequently, what might have moved the case dramatically forward has once again only resulted to severely delay adjudication of the case.

The Court's criticism is not reserved solely for Defendants. The charge that Plaintiffs fail to meet their initial burden is not wholly frivolous. Defendants complain that Plaintiffs fail to allege that the following asserted federal law violations "exist as to, or impact on, NUSD." (Response to MPSJ: *Lau* Oversight at 3):

1) Exit Criteria (Defendants allow school districts to determine LEP student proficiency based on criteria that exit students from *Lau* programs when scores on standardized tests show a significant lack of reading comprehension skills);

2) Performance Standards (Defendants fail to prescribe standards of academic performance to enable consistent judgments to be made regarding exited LEP students' functioning in regular classes);

3) 30–minutes of English Instruction (State guidelines allow *Lau* programs

which provide as little as 30–minute per day English language skills instruction); 4) IEPS (Defendants do not require school districts to have Individual Education Plan (IEPS) prepared by district personnel with professional training and skills necessary to devise and implement such plans); 5) Monitoring and Remedial Failures (Defendants fail to monitor district compliance with federal law and fail to develop and implement effective mechanisms for remedying program deficiencies).

Defendants are correct that Plaintiffs dispositive motions primarily rely on expert witness testimony which does not assert that these conditions exist in NUSD, but it is unnecessary for Plaintiffs to present evidence that State standards which apply to all of Arizona's schools, also apply in NUSD. Still, Defendants make a point when they complain that Plaintiffs rely primarily on expert witnesses, who have no knowledge regarding actual conditions in NUSD. For example, Plaintiffs' experts have not reviewed student performance in NUSD and compared it to student performance statewide, nor is there comparative curriculum evidence offered. Plaintiffs do not link their experts' assertions to existing conditions in Arizona's schools, such as NUSD. Consequently, there is an evidentiary void surrounding the issue of whether or not LEP students are attaining the minimum academic standards established by Defendants. Therefore, the Court cannot grant summary judgment for Plaintiffs.

The Court accepts responsibility for poor case management. This case should have been dismissed or tried years ago. Accordingly, the case shall be set for trial as soon as possible. This Order addresses each of Plaintiffs' Motions for Partial Summary Judgment and Defendants' assertion

that almost nothing remains as it was when the case was filed back in 1992 and whether or not these changes make this case moot, in whole or in part. Amazingly, relevant case law, especially for the disparate impact analysis under Title VI, has never been argued nor presented to this Court. Therefore, this Order also serves as a blue print for trial to set out the issues and the law the Court will apply.

*The Law*

*Roosevelt Elementary School
v. C. Diane Bishop:*

In *Roosevelt,* the same school financing scheme challenged here came under scrutiny by the Arizona Supreme Court and was found to violate Article XI of the Arizona Constitution. *Roosevelt I.*[3] On July 20, 1998, the Arizona legislature adopted "Students FIRST" which, according to Defendants, completely revamped Arizona's school financing scheme, and, pursuant to a stipulation by the parties, the Arizona Supreme Court ordered it constitutional. *(Response to MPSJ:* Lau *Funding at Ex. 2.).*

While the *Roosevelt* case primarily involved the State's school budget for capital improvements, the court found that capital disparities were caused by the entire financing system, not just the capital side of the equation. The Court explained the relationship as follows:

> The public school financing system is separated into two categories: the capital financing scheme and the maintenance and operations financing scheme.... Because districts have the power to use budgeted capital funds for maintenance and operations, the two sides are interrelated. Moreover, the districts must rely, to some extent, on property tax based funding for both capital and maintenance and operations. We find that the capital disparities here

---

3. *Roosevelt Elementary School District No. 66, et al. v. C. Diane Bishop,* (*Roosevelt I*) 179 Ariz. 233, 877 P.2d 806 (1994) (en banc), *appeal after remand, Hull v. Albrecht,*

(*Roosevelt II*) 190 Ariz. 520, 950 P.2d 1141 (1997), *appeal after remand,* (*Roosevelt III*) 192 Ariz. 34, 960 P.2d 634 (1998).

are simply the first symptoms of a system-wide problem. It would therefore be both artificial and ineffective for us to limit our review to capital financing.

*Roosevelt I,* 877 P.2d at 810 n. 3.

Specifically, however, the Arizona Supreme Court in *Roosevelt* did not address the quality of education being provided in Arizona. The limited nature of the Court's holding is clear from the following excerpt:

> Although it seems intuitive that there is a relationship between the adequacy of education and the adequacy of capital facilities, the districts chose not to plead or prove such a relationship. The state claimed that this omission was fatal to the districts' case, but the districts argued that such a relationship, although intuitive, was not relevant to or essential to their claim. We agree with the districts. Even if every student in every district were getting an adequate education, gross facility disparities caused by the state's chosen financing scheme would violate the uniformity clause. Satisfaction of the substantive education requirement does not necessarily satisfy the uniformity requirement, just as satisfaction of the uniformity requirement does not necessarily satisfy the substantive education requirement.

*Roosevelt I,* 877 P.2d at 815 n. 7. *Roosevelt* did not answer the substantive education question posed here. *Roosevelt* did not determine whether the State's financing scheme has a disparate impact on the quality of the education being provided to children in Arizona's schools which are in predominantly minority districts which have large numbers of LEP and "at risk" students. *Roosevelt* was based on the mandates of the Arizona Constitution.[4] *Roosevelt* did not determine that Arizona's newly adopted school financing scheme, Students FIRST, satisfies the mandates of

Title VI or the EEOA. Consequently, the adoption of Students FIRST does not render moot the Plaintiffs' claim that Arizona fails to adequately underwrite district *Lau* Programs as required by federal law.

Although *Roosevelt* doesn't resolve the issues before this Court, it is still important. Within the context of testing the adequacy of capital facilities, the Arizona Supreme Court said that the State must establish minimum adequate standards and provide funding to ensure that no district falls below them. *Roosevelt* forced the State to set minimum facility standards for Arizona's schools, *estimate the actual cost of these facilities,* and provide funding mechanisms to ensure that all schools meet the minimum facility requirements. Here, the State has established minimum academic standards, and so the Court is only concerned with the later part of the *Roosevelt* analysis: whether the State's financing scheme is arbitrary and bears no relation to actual need. Guided by *Roosevelt,* this Court will scrutinize evidence estimating actual costs for operating the programs required by Title VI and the EEOA. Without such evidence, there is little point in discussing the adequacy of the State's financing scheme, Students FIRST, or Defendants' contention that Students First makes "more" money available to minority-dense school districts for "at risk" student programs or *Lau* programs.

*The Equal Education Act of 1974 (EEOA), 20 U.S.C. § 1703(f):*

The EEOA provides as follows:

> No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—

---

**4.** *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) foreclosed arguments based on the federal equal protection clause. The Court held that because education was nowhere to be found in the United States Constitution, it was not a fundamental right. Thus, the Court applied the rational basis test and not the compelling state interest test to judge the constitutionality of a state property tax based educational scheme.

(f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

20 U.S.C. § 1703.

In a case such as this one in which the appropriateness of a particular school system's language remediation program is challenged under § 1703(f), the Court's responsibility is threefold.

First, the court must examine carefully the evidence the record contains concerning the soundness of the educational theory or principles upon which the challenged program is based. This, of course, is not to be done with an eye toward discerning the relative merits of sound but competing bodies of expert educational opinion, for choosing between sound but competing theories is properly left to the educators and public officials charged with responsibility for directing the educational policy of a school system. The state of the art in the area of language remediation may well be such that respected authorities legitimately differ as to the best type of educational program for limited English speaking students and we do not believe that Congress in enacting § 1703(f) intended to make the resolution of these differences the province of federal courts. The court's responsibility, insofar as educational theory is concerned, is only to ascertain that a school system is pursing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy.

The court's second inquiry would be whether the programs and practices actually used by a school system are reasonably calculated to implement effectively the educational theory adopted by the school. We do not believe that it may fairly be said that a school system is taking appropriate action to remedy language barriers if, despite the adoption of a promising theory, the system fails to follow through with practices, resources and personnel necessary to transform the theory into reality.

Finally, a determination that a school system has adopted a sound program for alleviating the language barriers impeding the educational progress of some of its students and made bona fide efforts to make the program work does not necessarily end the court's inquiry into the appropriateness of the system's actions. If a school's program, although premised on a legitimate educational theory and implemented through the use of adequate techniques, fails, after being employed for a period of time sufficient to give the plan a legitimate trial, to produce results indicating that the language barriers confronting students are actually being overcome, that program may, at that point, no longer constitute appropriate action as far as that school is concerned. We do not believe Congress intended that under § 1703(f) a school would be free to persist in a policy which, although it may have been "appropriate" when adopted, in the sense that there were sound expectations for success and bona fide efforts to make the program work, has, in practice, proved a failure.

*Castaneda v. Pickard,* 648 F.2d 989, 1009–1010 (5th Cir.1981). Within this framework, the Court will analyze whether Arizona's LEP programs, specifically those operating in school districts like Nogales, are appropriate action within the meaning of § 1703.

As noted by the court in *Castaneda,* Congress has provided us with almost no guidance, in the form of text or legislative history, to assist us in determining the standard to apply when considering whether a language remediation program is "appropriate." This is the type of task which federal courts are ill-equipped to perform. We are often criticized for undertaking to prescribe substantive standards and policies for institutions whose governance is

properly reserved to other levels and branches of our government (i.e., state and local educational agencies) which are better able to assimilate and assess the knowledge of professionals in the field. Confronted, reluctantly, with this type of task in this case, this Court will fulfill the responsibility Congress has assigned to it without unduly substituting its educational values and theories for the educational and political decisions reserved to state or local school authorities or the expert knowledge of educators.

### Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d:

Title VI provides as follows:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Plaintiffs allege a violation of Title VI's implementing regulations which prohibit any recipient of federal funding from the following:

utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

34 C.F.R. § 100.3(b)(2). Under Title VI's implementing regulations, proof of discriminatory intent is not a prerequisite to a private cause of action against governmental recipients of federal funds. Proof of discriminatory effect suffices to establish liability under the regulations. *Larry P. by Lucille P. v. Riles,* 793 F.2d 969, 981–82 (1984) (en banc).

The Ninth Circuit in *Larry P.* applied the analysis used for Title VII disparate impact claims to Title VI. *See Larry P.,* 793 F.2d at 982 n. 9 (courts generally apply the standards applicable to disparate impact cases under Title VII to disparate impact cases arising under Title VI); *Ass'n of Mexican–American Educators v. California,* 937 F.Supp. 1397, 1399 n. 42 (N.D.Cal.1996); *accord: New York Urban League, Inc. v. New York,* 71 F.3d 1031, 1036 (2nd Cir.1995); *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1407 & n. 14 (11th Cir.1993); *Sandoval v. Hagan,* 7 F.Supp.2d 1234, 1279 (M.D.Ala. 1998); *Groves v. Alabama State Bd. of Educ.,* 776 F.Supp. 1518, 1523 (M.D.Ala. 1991). In *Larry P.,* the court held that a prima facie case is demonstrated by showing the challenged policy or practice has a discriminatory impact on minority children. *Larry P.,* 793 F.2d at 982 (citing *Board of Education of New York v. Harris,* 444 U.S. 130, 151, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979)). "Once a plaintiff has established a prima facie case, the burden then shifts to the defendant to demonstrate that the requirement which caused the disproportionate impact was required by an educational necessity." *Id.* (citations omitted).

*Larry P.* was decided prior to the Title VII case *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). In *Wards Cove,* the Supreme Court held that a prima facie case is made by: 1) establishing that the employer's practice has a disparate impact on a protected group; 2) demonstrating that the practice in question caused the disparity, and 3) demonstrating that the practice has a significantly disparate impact on employment opportunities. In *Wards Cove,* the Supreme Court repudiated the widespread assumption that the burden of proof shifts entirely to the defendant during the second phase of a disparate impact case. The Court held that "the employer carries the burden of producing evidence of a business justification for his employment practice, but the burden of persuasion remains with the disparate-impact plaintiff." *Wards Cove,* 490 U.S. at 659, 109 S.Ct. 2115. In addition,

the Supreme Court reduced the defendant's burden by requiring only a showing of "business justification," meaning that "a challenged practice serves, in a significant way, the legitimate employment goals of the employer," rather than showing of business necessity. *Wards Cove,* 490 U.S. at 658–59, 109 S.Ct. 2115.

In response to *Wards Cove,* Congress passed the Civil Rights Act of 1991 (1991 CRA), effective November 21, 1991, which codified the prima facie standards of *Wards Cove,* but restored the burden of proof standards as they existed prior to *Wards Cove.* 42 U.S.C. § 2000e–2(k); *Ass'n of Mexican–American Educators,* 937 F.Supp. at 1405; *Stender v. Lucky Stores,* 1992 WL 295957 *2 (N.D.Cal.1992) (citing 137 Cong.Rec. § 15276 (daily ed. Oct. 25, 1991): passage of the 1991 CRA returned the disparate impact analysis to the standards articulated in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). The statute provides as follows:

> An unlawful employment practice based on disparate impact is established ... only if—
>
> (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or
>
> (ii) the complaining party [makes a showing of] an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

42 U.S.C. § 2000e–2(k)(1)(A) (1994).

Accordingly, Plaintiffs must demonstrate, by a preponderance of the evidence, their prima facie case of disparate impact. *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424 (9th Cir.1990) (citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 985–988, 108 S.Ct. 2777, 101 L.Ed.2d 827

(1988)). Only then, does the burden shift to the defendant to produce evidence that its disparate practices are based on legitimate business reasons, such as job-relatedness or business necessity. *Id.* In the event, the defendant makes a business necessity defense, Plaintiff can still prevail by showing that there are other alternatives that would serve the business purpose without a similarly undesirable discriminatory effect. *Id.* (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)).

In *Ass'n of Mexican–American Educators v. California,* 937 F.Supp. 1397 (N.D.Cal.1996), the district court was looking at whether a test used to determine teacher certification which minorities failed in disproportionately high numbers violated Title VI. The State argued that minorities lacked equal educational opportunities compared to the anglo-population, and, therefore, had a higher failure rate. The court held that the Ninth Circuit rejects the notion that a defendant's challenged practice is "ok" if the disparate impact results from some facially non-discriminatory factor. *Ass'n of Mexican–American Educators,* 937 F.Supp. at 1410. Instead of addressing causation, the court relied on the "80–percent–rule" prescribed by the Uniform Guidelines of Employee Selection Procedures, 29 C.F.R. pt. 1607 (1978): "a selection rate for any race, sex, or ethnic group which is less than (⅘) four-fifths (or eighty percent) of the rate for the group with the highest selection rate" is a showing of adverse impact. *Id.* at 1406–17. Ultimately, however, the court held that the test, CBEST, did not violate Title VI because it measured job-related characteristics, and there was no other cost-effective alternative.

In *Teresa v. Berkeley Unified School District,* 724 F.Supp. 698 (N.D.Cal.1989), another court was asked to infer a Title VI violation because Defendants provided the challenged LEP programs to Plaintiffs, who were minority students. The court

held that the plaintiffs must offer proof that the challenged action has a discriminatory impact. *Id.* at 716. "A Title VII plaintiff does not make out a case of disparate impact simply by showing that, 'at the bottom line,' there is a racial imbalance." *Wards Cove,* 490 U.S. at 657, 109 S.Ct. 2115. The Court in *Wards Cove* explained that plaintiffs have to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they attack. *Id.* "To hold otherwise would result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.'" *Id.* (quoting *Watson,* 487 U.S. at 992, 108 S.Ct. 2777).

While these two cases seem somewhat incompatible, both fit within the disparate impact frame work of *Rose v. Wells Fargo,* 902 F.2d 1417 (9th Cir.1990). After reading a multitude of disparate impact cases, the Court finds that *Rose,* best articulates the legal standards to apply in a disparate impact case. *Rose* was an age discrimination case, where the court held that the shifting burden of proof applied to Title VII discrimination claims also applies to claims arising under the Age Discrimination in Employment Act of 1967 (ADEA). The court applied the law, as follows:

> In order to establish a prima facie case of disparate impact, the plaintiff must: (1) identify the specific employment practices or selection criteria being challenged; (2) show disparate impact; and (3) prove causation; **"that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."** *See id. [Watson v. Fort Worth Bank & Trust,* 487 U.S. 977], 108 S.Ct. [2777] at 2788–89[, 101 L.Ed.2d 827 (1988)].* **The statistical disparities "must be sufficiently substantial that they raise such an inference of causation."** *Id.*

at 2789. The "significance" or "substantiality" of numerical disparities is judged on a case by case basis. *Id.* at 2789 n. 3. *Rose,* 902 F.2d at 1424. Making this prima facie case is especially important because unlike a disparate treatment case, where a plaintiff need only present evidence sufficient to give rise to an inference of discrimination, in a disparate impact case, plaintiffs must do more, plaintiffs must actually prove the discriminatory impact at issue. *Rose,* 902 F.2d at 1421; *Garcia v. Spun Steak Comp.,* 998 F.2d 1480, 1486 (9th Cir.1993), *cert. denied,* 512 U.S. 1228, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994). Only then does the burden shift to the defendant to produce evidence that its disparate employment practices are based on legitimate business reasons, such as job-relatedness or business necessity. *Id.*

In *Rose,* the court of appeals affirmed the district court's dismissal of the plaintiffs' disparate impact claims on the grounds that they failed to establish a prima facie case because the terminations were based on the eliminations of plaintiffs' jobs and not because of their age. *Rose,* 902 F.2d at 1424, 1427. In *Ass'n of Mexican–American Educators,* the court seemed to consider the 80–percent–rule as being significant and substantial enough to shift the burden to defendants. Whereas, in *Teresa,* the court refused to infer, minus any statistical or other evidence, that the challenged LEP program had a discriminatory impact on minority students. Neither of these cases are precedential, but both are examples that the Ninth Circuit requirement that the practice in question disparately impact the plaintiffs because of their membership in a protected group, *Rose,* 902 F.2d at 1424.

The following Title VI cases are most consistent with the Title VII analysis set out in *Rose:*

> *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394 (11th Cir.1993) Title VI challenge to a school site location because it benefitted the anglo-community to disadvantage of minorities. The

court applied the following test: If plaintiff makes prima facie showing, defendant must prove that there exists a substantial legitimate justification for the practice; if defendant carries this rebuttal burden, plaintiff will still prevail by showing that there exists a comparably effective alternative which would result in less disproportionality. *Id.* at 1407. Plaintiff's duty to show that the practice has disproportionate effect requires plaintiff to demonstrate a causal link between the practice and the disparate impact identified. "Thus the plaintiff cannot make out a prima facie disparate impact claim if the evidence tends to show that even had the defendant not engaged in the challenged practice, the same disparate impact would nonetheless have existed." *Id.* at 1407 (citing *United States v. Lowndes County Board of Education*, 878 F.2d 1301, 1305 (11th Cir.1989) (racial imbalance in public schools amounts to violation only if it results from some form of state action, not from other factors such as housing patterns); *see also Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992)). The court, assumed that the site location of the new school had a disparate impact, but held that there was a legitimate reason for the decision. Plaintiffs had also challenged the school boards' failure to prevent zone-jumping by anglo-students who avoided minority schools by attending out-of-district schools. The court recognized that zone-jumping disparately impacted on minority students, but held there was no Title VI violation because there was nothing defendant could have done to stop zone-jumping.

*African American Legal Defense Fund, Inc. v. New York State Dept.*, 8 F.Supp.2d 330 (S.D.N.Y.1998) Title VI challenge to funding system for public schools where funding was apportioned per student based on attendance rather than enrollment. The court applied the following test: Plaintiff must make prima facie showing that conduct has disparate impact, once such a showing has been made, burden shifts to defendant to demonstrate the existence of a substantial legitimate justification for the allegedly discriminatory practice. If defendant sustains this burden, plaintiff may still prove his case by demonstrating that other less discriminatory means would secure the same objective. *Id.* at 338 (citing *New York Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2nd Cir.1995)). The court held that plaintiffs failed to make a prima facie case because the funding system didn't cause the disparate impact. Various societal factors caused low minority school attendance, which resulted in the funding system having a disparate impact on minority schools. *Id.* at 338–39. Title VI requires federal grantees that produced disparate impacts to take corrective measures. *Id.* (citing *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)). Defendants didn't produce the disparate impact.

*Powell v. Ridge*, 1998 WL 804727 * 14 (E.D.Pa.1998) Plaintiffs charged that school financing formula had a disparate impact on inner city minority children because they have greater educational needs than their affluent counterparts. The court considered disparate impact cases adjudicated under the Federal Rehabilitation Act, which requires that handicapped individuals must be provided with meaningful access to the benefits the defendant offers, and the benefit itself cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled, but handicapped individuals do not have a right to more public services than the non-disabled, even if they need them. *Id.* at *15–16 (citing *Alexander v. Choate*, 469 U.S. at 287, 301, 105 S.Ct. 712; *Cercpac v. Health and Hospitals Corp.*, 147 F.3d 165, 167 (2d Cir.1998). No Title VI violation where factors external to state subsidy program make

education more expensive or funding shortfalls greater for inner-city schools than those in outlying areas. *Id.*

To prevail, Plaintiffs must establish that the challenged practice caused an adverse impact. *Rose,* 902 F.2d at 1424; *Wards Cove,* 490 U.S. at 657, 109 S.Ct. 2115. Again this Court will look to the *Roosevelt* cases for guidance. Plaintiffs in *Roosevelt* charged that State's school financing system violated the Arizona Constitution, Article XI, which provides as follows:

The Legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system, . . .

*Roosevelt I,* 877 P.2d at 812. Under *Roosevelt,* it is the State's duty to establish and maintain a general and uniform public school system. *Id.* at 813.

In its attempt to define the "general and uniform" requirements of Article XI, the Supreme Court distilled the following two fundamental principles:

First, units in "general and uniform" state systems need not be exactly the same, identical, or equal. Funding mechanisms that provide sufficient funds to educate children on substantially equal terms tend to satisfy the general and uniform requirement. School financing systems which themselves create gross disparities are not general and uniform.

The second principle relates to the tension that exists between the competing values of local control and statewide standards. As long as the statewide system provides an adequate [ ] education, and is not itself the cause of substantial disparities, local political subdivisions can go above and beyond the statewide system. Disparities caused by local control do not run afoul of the state constitution because there is nothing in Article XI that would prohibit a school district or a county from deciding for itself that it wants an educational system that is even better than the gen-

eral and uniform system created by the state.

*Roosevelt I,* 877 P.2d at 814–15.

In its application of the second principle, the Arizona court specifically considered the issue now before this Court: whether disparities between school districts were the result of the financing scheme chosen by the state. *Id.* at 242. *Roosevelt* spanned three different legislative schemes for financing Arizona's public school system: 1) the system in place at the time *Roosevelt* and this case were filed; 2) the Assistance to Build Classrooms Fund (ABC legislation), adopted in 1997; and the Students FIRST Act of 1998. In all instances, the Arizona Supreme Court held that these financing schemes caused substantial disparities between Arizona's school districts.

Ultimately, pursuant to a stipulation entered into by the parties, the Arizona Supreme Court ordered the financing scheme, Students FIRST, to be facially valid and that no further constitutional challenges remained. (*See* Response to MPSJ Lau Funding at Exhibit 2.) The Court does not know the specifics of the parties' stipulated agreement regarding the constitutionality of Students FIRST to conclude that the State's school financing scheme, as it exists today, provides adequate funding to school districts such as NUSD, specifically as it pertains to LEP programs. Assuming that the parties in *Roosevelt* only resolved the disparities in the school financing system as they affected capital improvements, the flaws in Arizona's school financing system might still exist as it pertains to operation and program funds. Consequently, the infirmities described in the *Roosevelt* cases might still apply, here.

As explained by the various *Roosevelt* decisions, and as the State conceded in *Roosevelt I,* 877 P.2d at 816, and *Roosevelt II,* 950 P.2d at 1143, the State's school financing system results in disparities in revenue-raising abilities among districts because it relies heavily upon property

taxes at the school district level. *Roosevelt II,* 950 P.2d at 1144. "Because the presence of taxable property within each district bears no relationship to the capital needs of each district, it is difficult to create a general and uniform system with such heavy reliance upon district based property taxation." *Id.* at 1144; *see also, Roosevelt III,* (again rejecting legislation, Students FIRST, because even though the legislature ensured that all districts would receive adequate funds to meet minimum capital facility needs, the legislature chose a system that caused substantial disparities between the revenues available to the different districts. Specifically, Students FIRST created two local financing options: 1) participating districts were limited to receiving the state allotment, whereas 2) opt-out districts had to rely solely on local financing, but had access to various mechanisms, such as bonding, which would enable them to raise funds exceeding what was available to participating districts.)

 Assuming such disparities continue under the school financing system now in existence, are they actionable under Title VI? Under *Rose,* the disparate impact must fall on plaintiffs because of their membership in a protected group, *Rose,* 902 F.2d at 1424, not because they are poor or because they reside in lower-wealth school districts. Only funding related disparities which can be so linked are actionable here. Only in this way can Plaintiffs demonstrate, by a preponderance of the evidence, their prima facie case of disparate impact under Title VI. *Rose,* 902 F.2d at 1424 (citing *Watson,* 487 U.S. at 985–988, 108 S.Ct. 2777). Thereafter, the burden will shift to the Defendant to produce evidence that its disparate practices are based on substantial legitimate reasons related to the business of public education. *Id.* In the event, the Defendants make a business necessity defense, Plaintiff can still prevail by showing that there are other alternatives that would serve the State's purpose without a similarly undesirable discriminatory effect. *Id.* (citing *Albemarle Paper Co. v. Moody,* 422 U.S. at 425, 95 S.Ct. 2362)).

### *The Issues: Plaintiffs' Motions for Partial Summary Judgment*

1. *Plaintiffs' Motion for Partial Summary Judgment: Defendants allow Arizona's school districts to administer Lau programs which do not meet federal standards and fails to monitor district compliance with federal standards (MPSJ:Lau Oversight).*

Federal law mandates that public schools provide LEP children with a program of instruction calculated to make them proficient in speaking, understanding, reading, and writing English, while enabling them to master the standard academic curriculum as required of all students. *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). The Arizona State Board of Education recently decreed in policies and regulations that in order to receive high school degrees, students must demonstrate mastery of the revised Arizona Essential Skills (Essential Skills or AES).[5] The State-prescribed test for measuring attainment of such skills is the Arizona Instrument to Measure Skills (AIMS). Effective in the school year 2000–2001, a student will have to pass the

---

5. Prior to 1998, A.R.S. § 15–701.1 required the state board of education to prescribe competency requirements for the graduation of pupils from high school incorporating the essential skills in the areas of reading, writing and mathematics. The board prescribed the Arizona Assessment Standards (AAS) and its corresponding testing program, the Arizona Student Assessment Program (ASSAP). In 1998, A.R.S. § 15–701.1 was amended so that in addition to prescribing competency standards, the state board of education is required to develop and adopt competency tests for the graduation of pupils from high school in at least the areas of reading, writing and mathematics and to establish passing scores for each such test. The state board has prescribed that the AIMS test shall be used to test Essential Skills.

AIMS test in order to receive a high school diploma.

Plaintiffs submit that the Essential Skills constitute and determine the principal educational benefits provided by the State, under the mandates of 34 C.F.R. Part 100 and 20 U.S.C. § 1703(f) that LEP students have full and equal opportunity to master the Essential Skills, meaning pass the AIMS test and graduate from high school with a diploma.

State regulations, in compliance with federal law, provide that all district enrollees with a primary or home language other than English (PHLOTE students) must be promptly evaluated through prescribed testing to determine whether they lack proficiency in speaking, understanding, reading or writing English. A PHLOTE student lacking either proficient oral skills or reading or writing skills must be classified limited English proficient (LEP) and placed in a *Lau* program. Every two years, schools must reassess LEP students' English proficiency skills to determine the progress of the students toward proficiency in English, to identify necessary improvements to the *Lau* instruction being provided, and to identify students who can be reclassified English proficient and exited from *Lau* programs to regular classes.

Trial shall be set to determine Plaintiffs' charge that Defendants are violating federal law in their oversight of *Lau* programs in Arizona's school districts, specifically, as follows:

*Exit Criteria:* Defendants authorize school districts to determine that LEP students have developed sufficiently proficient English literacy skills so that they can be reassigned from *Lau* programs to regular, English-only instruction, even when their scores on standardized tests signify a lack of reading comprehension skills necessary for satisfactory performance of coursework aligned with the revised Arizona Essential Skills (Essential Skills).

*Performance Standards:* Defendants do not prescribe standards of academic performance to enable consistent judgments to be made as to whether students exited from *Lau* programs are functioning satisfactorily in regular classes; therefore, districts fail to identify and provide federally mandated services necessary to remedy skill and knowledge deficits. *30–minutes of English Instruction:* Defendants allow *Lau* programs which provide as little as 30–minute per day English language skills instruction.

*IEPs:* Defendants do not require the districts to have Individual Education Plans (IEPs) prepared by district personnel with the professional training and skills necessary to devise and implement plans satisfying federal program requirements.

*Monitoring and Remedial Failures:* Defendants fail to monitor district compliance with federal *Lau* requirements and develop effective mechanisms for remedying program deficiencies.

2. *Plaintiffs' Motion for Partial Summary Judgment: Defendants' Failure to Adequately Underwrite District Lau Programs as required by Federal Law.*

Plaintiffs argue that the Defendants are violating 20 U.S.C. § 1703(f) and 34 C.F.R. Part 100 by failing to provide Arizona school districts with financial resources necessary to instruct LEP students "to make them proficient in understanding, speaking, reading and writing English, while enabling them to master the standard academic curriculum as required of all students." *See Lau,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1; *Castaneda v. Pickard,* 648 F.2d at 1009–1011 (construing 20 U.S.C. § 1703(o); *accord Gomez v. Illinois State Board of Education,* 811 F.2d at 1041–1045. For example, Plaintiffs complain that districts are unable to hire and/or train qualified LEP teachers and staff, and that districts lack necessary text books and other resources, especially

in content-area materials. (Second Amended Complaint at 20(a)–(h).) This Court rejects Defendants' assertion that Plaintiffs' claim is moot because the Arizona legislature adopted Students FIRST; therefore, the issue of whether the State adequately funds district LEP programs shall be decided at trial. As explained in this Order, the Court will look to *Roosevelt* to guide its assessment of whether the new, Students FIRST, financing scheme enables school districts to implement effective *Lau* programs.

3. *Non–Lau Claim Arising Under 34 C.F.R. Part 100.*

When this case was filed, the State School Board had adopted the Arizona Essential Skills which were a compilation of academic skills and content-area knowledge that the State Board had determined all students in Arizona's public school system, except those with certain disabilities, ought to master in the course of their matriculation through the system. The Board approved the Arizona Student Assessment Program (ASAP) to determine whether students were progressing toward proficiency in the Arizona Essential Skills, but did not specify ASAP test scores to be indicative of mastery of the Arizona Essential Skills. The Board allowed districts to determine mastery level scores, which varied substantially across districts. (*See*

Second Amended Complaint at ¶ 37, 38) (districts devise their own criteria for determining mastery of State-prescribed essential skills, which enables districts to report that their students have met minimum competency requirements when students cannot perform comparative to non-minority, English speaking students).

In 1994, Congress adopted the Improving America's Schools Act (IASA) (1994). 20 U.S.C. §§ 6301 et. seq., 20 U.S.C. § 6311(a), (b)(1)(A)–(D).[6] State academic achievement standards, such as the Essential Skills, together with an assessment protocol, such as the ASAP, are necessary to qualify Arizona for federal grants through IASA. Utilizing IASA terminology, the Essential Skills are now called the Arizona Assessment Standards (AAS) and the testing protocol is called the Arizona Instrument for Measuring Standards (AIMS). The State Board has also determined that in order to receive high school diplomas, all students in the Arizona public school system, except those with certain disabilities, must earn satisfactory AAS/Essential Skills scores on the AIMS tests, effective in 2000–2001. The IASA does not require such graduation competency testing dispositive of entitlement to a high school diploma. The IASA only calls for State plan provisions that address adequate yearly progress by each school dis- ·

---

**6.** Declaration of policy and statement of purpose

 (a) Statement of policy

 (1) In general

 The Congress declares it to be the policy of the United States that a high-quality education for all individuals and a fair and equal opportunity to obtain that education are a societal good, are a moral imperative, and improve the life of every individual, because the quality of our individual lives ultimately depends on the quality of the lives of others.

 \*\*\* ·

 (b) Recognition of need

 The Congress recognizes that—

 (1) although the achievement gap between disadvantaged children and other children has been reduced by half over the past two decades, a sizable gap remains, and many

segments of our society lack the opportunity to become well educated;

 (2) the most urgent need for educational improvement is in schools with high concentrations of children from low-income families and achieving the National Education Goals will not be possible without substantial improvement in such schools;

 (3) educational needs are particularly great for low-achieving children in our Nation's highest-poverty schools, children with limited English proficiency, children of migrant workers, children with disabilities, Indian children, children who are neglected or delinquent, and young children and their parents who are in need of family-literacy services;

 \*\*\*

20 U.S.C. § 6301(a), (b) (1995).

trict and school toward achievement of IASA's goal that all children, "particularly economically disadvantaged and limited English proficient children . . . ," 20 U.S.C. § 6311(b)(2)(B)(i), meet the State's proficient and advanced levels of performance, as set forth in its academic assessment standards (AAS).

The AAS constitute the State's specification of baseline academic attainment that all children ought to realize in the course of their matriculation and comprise the core educational benefits, within the meaning of 34 C.F.R. Part 100. Plaintiffs argue that minority children from low-income households and LEP students are burdened with pronounced disadvantages in learning academic skills and content-area knowledge comprising a curriculum that fulfills the high academic standards States are setting in order to qualify for various kinds of federal financial assistance. Without instructional interventions, such as those designed and funded by Title I, these at-risk children cannot be expected to attain proficiency in academic skills and content areas, as measured by required assessment tests like the AIMS. Equal benefits are not realized if a student fails to demonstrate sufficient attainment of academic skills and content-area knowledge, according to State-mandated achievement testing (AIMS), and fails to attain a high school diploma.

Plaintiffs may go forward with this claim to the extent that they establish a link between the disparate impact of the State's educational system and the Plaintiffs' membership in a protected group, such as race, color, or national origin, — not membership in a socio-economic group. This Court rejects any attempt to broaden this action beyond Title VI or the EEOA. While Defendants may be violating IASA or Title XI of the Arizona Constitution, those claims are not before this Court. In fact, those claims didn't even exist in 1992 when Plaintiffs filed this case. The IASA related AIMS test which Plaintiffs allege they will fail in disproportionately large numbers compared to English speaking anglo-students, in part, addresses the complaint that school districts devise their own criteria for determining whether their students have mastered essential skills, (Second Amended Complaint at ¶ 37), and thus report that most of their students have met minimum competency requirements, when in fact, a majority have not acquired State-prescribed essential skills, (Second Amended Complaint at ¶ 38). AIMS testing, implemented state-wide, will remedy this. At trial, this Court will admit evidence regarding Plaintiffs' pass or fail rates on various academic tests, including AIMS, only as it is relevant to establish the success or failure of the *Lau* programs and to show that students are, or are not, acquiring State-prescribed essential skills.

Accordingly,

**IT IS ORDERED** that all pending motions are DENIED.

**IT IS FURTHER ORDERED** that this matter is set for a Pretrial Conference on June 7, 1999, at 10:30 a.m. A trial date shall be set at the Pretrial Conference.

**IT IS FURTHER ORDERED** that ten days prior to the Pretrial Conference, the parties shall file an Amended Pretrial Order, reflecting the determinations made by the Court as set forth in this Order, to identify the issues to be determined at trial.

**IT IS FURTHER ORDERED** that ten days prior to the Pretrial Conference, the parties may also file trial briefs setting out any relevant case law, either contrary or supplemental to the law as set out in this Order. All Motions in Limine must also be filed by this date.

**IT IS FURTHER ORDERED** that no further dispositive motions may be filed. There will be no further extensions granted in this case. Failure to comply with the above dates or to proceed directly to trial once a trial date is set shall result in dismissal of this action.